# BERTHOLD et al. v. ST. LOUIS ELECTRIC CON-
## STRUCTION COMPANY, Appellant.

**Division Two, November 26, 1901.**

1. **Contract:** BREACH: TENDER OF PERFORMANCE: RECOVERY. If one party while engaged in executing a contract is notified by the other that he has annulled and repudiated it, the first party may stop, and without tendering further performance, bring his action to recover the contract price for the work performed or goods furnished, and for his damages for the difference between the contract price and what it would have cost to perform the uncompleted part. The unqualified annulment of a contract by one party, without reasonable cause, and a refusal to permit the other to perform his part, is tantamount to a compliance with the contract by such other party.

2. **Recovery Without Performance.** It is held that an instruction set out in full in this case does not permit a recovery on the contract, for the work performed thereunder by plaintiff prior to the time of its annulment by defendant, without requiring a performance of the contract by plaintiff.

3. ———: PAY BY INSTALLMENTS: ANNULMENT: RECOVERY. Where work is done under a contract which provides for payment by installments, if the party who so agrees fails to so pay, the other party may quit the work and recover for all he has done at the contract price.

4. **Issues Admitted by Pleadings:** FINDING: BREACH OF CONTRACT. The court sitting as a jury is not required to submit to himself the finding of a fact conceded by the pleadings. And where defendant's answer admits the annulment of a contract, but asserts just cause therefor, it is not error to give an instruction which is a necessary deduction from his finding that defendant had broken the contract without just cause.

5. ———: ———: RECOVERY NOTWITHSTANDING ERRONEOUS INSTRUCTION. Where the whole evidence shows that plaintiff had performed a part of the work under the contract prior to its annulment, and that defendant had inspected and accepted it, and had suffered no

damages for any breach thereof by plaintiff, the judgment for plaintiff for the value of the work done at the contract price, should stand, notwithstanding an erroneous instruction may have been given in his behalf.

6. ———: ANNULMENT: TENDER OF PERFORMANCE. Where there is an executory contract for the supplying of goods from time to time, to be paid for by installments after delivery, if the purchaser having received and accepted a portion of the goods contracted for, gives notice to the vendor that the contract is annulled because of the vendor's failure to comply therewith, which annulment the court finds on the trial to have been without reasonable cause, the vendor, having been desirous and able to complete the contract, may without tendering the rest of the goods, maintain an action against the purchaser for breach of contract.

7. ———: ———: SUBLETTING:· INSPECTION: APPLICABILITY TO BREACH. A contract for the sale and delivery of telephone poles provided that the vendor should "give his personal attention to the work and not sublet the same or any part thereof without the written consent" of the purchaser, and that a "failure to comply with this stipulation ...... shall be deemed a breach of the contract" if the purchaser "shall so elect." The purchaser knew that the character of poles required were to be had only in a distant State, and that the vendor had contracted with a supply company in that State to furnish them, and sent his inspector there, who left an order with the supply company for a lot of poles instead of giving it to the vendor, and there received the ties without an intimation that the purchaser considered this a breach on the part of the vendor— the contract on its face reserving the right to the purchaser to have an inspector at the place where the ties were obtained and also at their place of delivery. *Held, first,* that, the contract being one for the sale of materials, this subletting provision refers to work, and, hence, had no application as a defense to a suit for damages for the annulment of the contract by the purchaser; *second,* there was no subletting or assignment of the contract under the facts in evidence.

8. ———: BREACH: PERFORMANCE: SATISFACTORY RATE OF PROGRESS. The contract for the delivery of telephone poles provided that "the delivery shall begin within sixty days after the award of the contract, and continue uninterruptedly and be completed six months after said sixty days," and further said: "It is hereby mutually agreed and expressly understood" that the purchaser "shall have·the right to suspend the execution of this contract, and to annul the same whenever" the vendor "shall fail to carry out the work with a sat-

isfactory rate of progress." *Held,* that, the contract being an ordinary one for materials, the court correctly construed it as requiring that reasonable progress in the delivery of the poles which a reasonable man under like circumstances would regard as a satis- factory rate of progress, and not as giving the purchaser the arbi- trary right to annul it whenever he saw fit without regard to the rights of the vendor or the other stipulation thereof; *and,* what is, a satisfactory progress under the contract was peculiarly a question of fact.

9. ———: ———: MEASURE OF DAMAGES. Where a contract for the purchase of telephone poles is wrongfully annulled by the purchaser, the vendor's measure of damages, where the purchaser has bought from another the complement of poles, of the same size for the same price as specified in the contract, is the difference between the con- tract price and the amount it would have cost the vendor to fur- nish and deliver the poles, under the contract, and that cost, where such poles are not carried in stock at the place of delivery, is their cost at the log camp, plus the transportation charges, plus the cost of trimming them to meet the requirement of the contract.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood,* Judge.

AFFIRMED.

*Boyle, Priest & Lehmann* and *Geo. W. Easley* for appel- lant.

(1) The first count of the petition is clearly an action upon the contract, and performance must be shown before a re- covery thereon can be had. The first declaration allows a re- covery, without requiring a finding of performance on the part of the plaintiffs or any legal excuse for their non-performance. This is clearly erroneous. Eyerman v. Mount Sinai Ceme- tery, 61 Mo. 489; Helm v. Wilson, 4 Mo. 41; Lee v. Ashbrook, 14 Mo. 378; Downey v. Burke, 23 Mo. 228; Lowe v. Sinclair, 27 Mo. 309; Marsh v. Richards, 29 Mo. 99; Creamer v. Bates, 49 Mo. 523; Yeats v. Ballentine, 56 Mo. 530; Cutter v. Powell, 2 Smith's Lea. Cas. 44. The first count being upon

the written contract, the recovery must be upon the contract or not at all. This is the rule in cases where the evidence discloses a cause of action on a *quantum meruit* for work done, or *quantum valebat* for materials furnished. Cole v. Armour, 154 Mo. 333. The better rule seems to be that had the defendant's acts prevented compliance with the contract by the plaintiffs on their part, the action should have been upon the common counts. Wright v. Haskell, 45 Me. 489; Dubois v. Delaware Canal Co., 4 Wendell, 285; Miller v. Thompson, 22 Ark. 258; Draper v. Randolph, 4 Harr. (Del.) 454; Planche v. Colburn, 4 Bing. 14, 1 Moore & S. 51, 5 Carr. & P. 58. (2) The second declaration of law made at the request of plaintiff is erroneous in the following particulars: (a) Profits can only be recovered when the contract has been terminated by the acts of the defendant "and must be treated and acted upon as such by the party to whom the promise was made; for if he afterwards continue to urge or demand a compliance with the contract it is plain that he does not understand it to be at an end." Benjamin on Sales, 424; Smoot's Case, 15 Wallace 48. (b) The failure of defendant to send inspectors to the places named by plaintiffs by their three offers of poles for inspection, did not prevent the plaintiffs from offering the poles at St. Louis, where the delivery and final inspection was to be made and had. (c) The pretended tender made in the three offers of poles for inspection in distant States did not authorize the plaintiffs to enforce the contract. They did not offer any evidence to show that said pretended tenders were made in good faith, and unless they were, and they had acquired the poles for the purpose of delivering the same to the defendant, it gave the plaintiffs no right to enforce the contract. Lewis v. White, 16 Ohio St. 444. (3) The third declaration given for plaintiff is erroneous; and it was error to refuse the fourth, asked by defendant. The third declaration for defendant broadly asserts that there is no evidence that plaintiffs sublet the contract between plaintiffs and defendant. The execution of the con-

tract between plaintiffs and the Northern Supply Company containing a stipulation that the latter company shall give personal attention to the identical work the plaintiffs had agreed to give their personal attention in the contract with plaintiffs, must be a substitution of the supply company for the plaintiffs; a subcontracting (in which sense the word "sublet" is used in the contract). If this does not amount to a subcontracting, it would be difficult to conceive what other legal effect it can have. Such being the contract of the parties, defendant had the right to have the contract performed by those in whom it had been confided. Implement Company v. Iron Works, 129 Mo. 222. It was an executory contract founded upon trust and confidence in the character and skill of the plaintiffs, and could not lawfully be assigned, sublet or subcontracted to the Northern Supply Company. Lansden v. McCarthy, 45 Mo. 106; Boykin v. Campbell, 9 Mo. App. 495; Redheffer v. Leathe, 15 Mo. App. 12; Sunday Mirror Co. v. Galvin, 55 Mo. App. 421; Leahy v. Dudgate, 27 Mo. 439. (4) The measure of damages on the second count of the petition should have been the difference between the market value of the poles and the contract price. These poles were not a manufactured article. The record shows that they were kept in stock at Chicago, in Michigan and Wisconsin, and had a market price at those places. That market price and the cost of carriage to St. Louis would make the market price at the place of delivery under the contract. Fitzgerald v. Hayward, 50 Mo. 524.

*Kehr & Tittmann* for respondents.

(1) The cause having been tried by the court without a jury, the facts upon which the court based its judgment are incontrovertible here. Hamilton v. Boggess, 63 Mo. 251; Gaines v. Fender, 83 Mo. 509; State ex rel. v. Staed, 143 Mo. 250; Creamer v. Bates, 49 Mo. 524; Rice, Stix v. McClure, 74 Mo. App. 384; James v. Hicks, 76 Mo. App. 115; Planing

M. Co. v. Spilker, 77 Mo. App. 414.    (2)    As to the poles
accepted and received by the defendant under the contract, it is
liable to the plaintiffs for the contract price.    Black R. L. Co.
v. Warner, 93 Mo. 386.    (3)    The payment for each month's
delivery of poles being due on the tenth day of the following
month, the contract is severable as to the payments earned, and
plaintiffs may sue for them without alleging performance of
the other covenants of the contract.    Turner v. Mellier, 59 Mo.
535; Adler v. Railroad, 92 Mo. 250; Lee v. Ashbrook, 14 Mo.
385; Smith v. Crews, 2 Mo. App. 269; Sawyer v. Christian,
40 Mo. App. 300; West v. Moser, 49 Mo. App. 209.    (4)
Defendant having annulled the contract and thereby prevented
further performance of it by the plaintiffs, the latter may re-
cover as if they had performed the contract. Chapman v. Rail-
road, 146 Mo. 493; Black River L. Co. v. Warner, 93 Mo.
374; Bean v. Miller, 69 Mo. 384; Little v. Mercer, 9 Mo.
220; Haplin v. Manny, 57 Mo. App. 61; Gabriel v. Brick Co.,
57 Mo. App. 526.    (5)    What is a satisfactory rate of prog-
ress depends on the circumstances of the case.    What in reason
ought to satisfy a contracting party, the law will hold does sat-
isfy him.    Mullally v. Greenwood, 127 Mo. 147.    (6)    The
measure of damages on the second count is the difference be-
tween the contract price and the amount it would have cost re-
spondents to furnish and deliver the remainder of the poles.
Chapman v. Railroad, 146 Mo. 508; Black River L. Co. v.
Warner, 93 Mo. 390; Crescent Mfg. Co. v. Nelson Mfg. Co.,
100 Mo. 325; Hammond v. Beeson, 112 Mo. 198; Brandt v.
Schuchmann, 60 Mo. App. 72; Park v. Kitchen, 1 Mo. App.
357; Masterson v. Mayor of Brooklyn, 7 Hill 72; Fox v.
Harding, 7 Cushing 516; Danforth v. Railroad, 93 Ala. 614;
Sedgwick on Damages (8 Ed.), sec. 618; Sutherland on Dam-
ages (2 Ed.), sec. 713; Wakeman v. Wheeler, 101 N. Y. 215;
Railroad v. Howard, 13 How. 307; Hinckley v. Pitts. S. Co.,
121 U. S. 275; Fairfield v. Jeffreys, 68 Ind. 582; Railroad v.
Lutes, 112 Ind. 276; Fisher v. Newark Ice Co., 62 Fed. 546;

Silberstein v. Duluth N. T. Co., 68 Minn. 430; Baker & Co. v. R. & I. Mfg. Co., 42 N. Y. Supp. 76.

GANTT, J.—In June, 1897, the St. Louis Electric Construction Company was desirous of purchasing a quantity of poles suitable for stringing telephone wires, and accordingly advertised for proposals to furnish them, inviting bids according to the specifications prepared by it.

The firm of Berthold & Jennings, the plaintiffs, were the successful bidders, and on June 21, 1897, said electric company and Berthold & Jennings entered into a written contract to which the specifications upon which the bids were made, were annexed and made part of the contract.

As the stipulations of the contract are constantly invoked by counsel to maintain their several contentions, it will be well to state the substance thereof.

By the contract and specifications, Berthold & Jennings agreed to furnish and deliver to the construction company on or before the twenty-first day of February, 1898, the materials set forth in the specifications, namely, white cedar poles of the following dimensions and approximate number, to-wit:

| Length of poles. —feet. | Minimum circumference at butt.—Inches. | Minimum circumference at top before shaving.—Inches. | Number of poles. | Length of pole from butt that is not to be shaved. |
|---|---|---|---|---|
| 30 | 36 | 20 |      | 5.5 |
| 30 | 39 | 23 | 1570 | 6.6 |
| 40 | 44 | 23 | 1570 | 7.6 |
| 45 | 47 | 23 | 950  | 7.6 |
| 50 | 50 | 23 | 575  | 7.6 |
| 55 | 53 | 23 | 145  | 8.6 |
| 60 | 53 | 22 | 225  | 8.6 |
| 65 | 56 | 22 | 35   | 9.6 |

For the poles so to be delivered, the construction company agreed to pay Berthold & Jennings as follows:

For poles 35 feet long......................$  3.74 each.
For poles 40 feet long......................   4.78 each.
For poles 45 feet long......................   6.11 each.
For poles 50 feet long......................  12.65 each.
For poles 55 feet long......................  13.53 each.
For poles 60 feet long......................  20.18 each.
For poles 65 feet long......................  25.85 each.

Payment for each month's delivery was to be made on the tenth of the month following the delivery.

The specifications provide that the "poles shall be of the best quality straight-grained white cedar, free from large or loose knots, checks and twists. They shall be straight, well proportioned from top to butt, the bark shall be entirely peeled, and the poles shaved in a neat and workmanlike manner from the top to a distance from the butt specified in the table hereinafter shown," and shall "be furnished and delivered f. o. b. cars, in the company's yards, at St. Louis, Missouri.

"The company will have a duly-appointed inspector at point of shipment, and the contractor shall not ship any material objected to by the inspector.

"The final inspection will take place at St. Louis, as material is unloaded from the cars, and if any pole is damaged in transit, it will be replaced by the contractor.

"Payment will be made on the report of the final inspectional at St. Louis. The payments will be made on the tenth of the month following the delivery, less ten per cent, which shall be retained until the contract has been completed, when it shall become due if the work has been fulfilled to the satisfaction of the general manager and chief engineer of the company.

"A bond for $25,000, satisfactory to the company, shall be furnished by the contractor."

The contract contained the following special provisions:

"The delivery shall begin within sixty days after the award of the contract and continue uninterruptedly and be completed six months after said sixty days. The *class* of poles to be shipped from time to time, shall be as ordered by the chief engineer of the company.

"The said party of the second part shall give his personal attention to the work and not sublet the same or any part thereof without the written consent of the party of the first part.

"Failure to comply with this stipulation or carry on the work as herein required either as to the rate of progress or otherwise shall be deemed a breach of this contract if the party of the first part shall so elect and any and all damages resulting therefrom shall be paid for by the said party of the second part."

Also this provision:

"It is hereby mutually agreed and expressly understood that the said party of the first part shall have the right to suspend the execution of this contract and to annul the same whenever the said party of the second part shall fail to carry out the *work* with a satisfactory rate of progress or comply with all and singular the terms and stipulations as herein set forth and that such suspension or annulment shall not affect the right of the party of the first part to recover any of the damages resulting from such failure."

Berthold & Jennings gave the bond required by the specifications and at once took steps to carry out their contract.

Among other things, they entered into contract with the Northern Supply Company, of Chicago, to obtain from it the poles which they had agreed to deliver to the construction company. The specifications in their contract with the Northern Supply Company are in the exact language of the specifications in the contract between themselves and the construction company, and require the Northern Supply Company to furnish to

Berthold & Jennings, delivered at St. Louis, all the poles which the latter had contracted to deliver to the construction company except the 225 poles of 60 feet and 35 poles of 65 feet, of which it agreed to furnish one-half.

Trees from which the poles called for by the contract are made, grow only in Michigan, Canada and some in Wisconsin and Minnesota. There is no market for poles in St. Louis. They are not carried in stock there.

On the second of July, 1897, Berthold & Jennings notified the construction company to have its inspector report at the office of the Northern Supply Company, in Chicago, July 5, to Mr. Koss, saying: "Mr. Koss will go with him and give him all instructions regarding inspection of the poles. Their headquarters will be Fisher, Michigan."

Upon receiving this notice, Mr. Ledlie, appellant's chief engineer, instructed Mr. Brennecke, one of the company's inspectors, then at Toledo, to report to Mr. Koss, in Chicago, which the inspector did on the morning of July 6. He went from there to Fisher, Michigan, where the Northern Supply Company was collecting the poles.

On July 14, Mr. Maxime Reber, the assistant engineer, got from Mr. Jennings letters of introduction to Mr. Faithorn, the president, and Mr. Bagley, the manager, of the Northern Supply Company. He presented both letters and spent July 17 at Fisher. The letters introduced him as engineer of the St. Louis Electrical Construction Company, "who get the poles you are getting out for us on recent contract." Mr. Reber on that date left with Bagley a memorandum or shipping order for the entire 5,000 poles, covered by plaintiffs' and defendants' contract, herein sued on.

The first shipment was made on the seventeenth day of July. On the twentieth day of July Mr. Jennings, one of the firm of plaintiffs, requested Mr. Ledlie, the chief engineer of defendant, to give him the orders for the poles and Ledlie re-

Vol 165 mo—19

plied he would send the orders up there; that he preferred to send the orders to the inspectors at Fisher, Michigan, and let them order them.

Between July 17 and September 13, 1897, the plaintiffs and Jennings shipped and delivered and the defendant received and accepted under the contract of June 21, 1517 poles of the contract price of $9,167.57.

On the fourteenth of September, 1897, the defendant served the following notice of the termination of the said contract:

"St. Louis Electric Construction Company,
"St. Louis, Mo., Sept. 13, 1897.
"Messrs. John S. Berthold and Custis M. Jennings, composing the firm of Berthold & Jennings, Chemical Bldg., St. Louis, Missouri.
"Gentlemen:

"In view of the palpable violation and disregard of your contract with this company for furnishing the poles, etc., in every essential and salient feature, this company hereby exercises the right, privilege and authority reserved in the last paragraph of said contract, to annul, and does hereby annul the same.

"It will proceed to obtain the poles, cross-arms etc., to the extent of your contract and will then settle with you after deducting damages for your breaches for whatever may be due you for poles already shipped.
"Yours truly,
"ST. LOUIS CONSTRUCTION CO.,
"By HENRY NICOLAUS, Second Vice-President.
"(Seal of Co.):  LAWRENCE B. PIERCE, Secretary.
"Attest:   (Rec'd September 14, 4 p. m.)"

Thereafter, on the sixteenth day of September, plaintiffs wrote the following letter to defendant:

"Berthold & Jennings, Wholesale Lumber,
                  "St. Louis, Mo., Sept. 16, 1897.
"St. Louis Electric Construction Co., St. Louis, Mo.

"Gentlemen: In reply to your communication of the thirteenth inst., regarding the annulment of the contract of June 21, 1897, between you and ourselves, we desire to state that we can not accept this annulment and are ready and willing to complete the delivery of material under said contract. We protest that we have not failed to carry out the contract in any particular, and must look to you for any damages sustained by us on account of your refusal to accept material.

"We offer you for inspection at Spalding, Michigan, the following poles and ask you to send inspector at once to inspect them: 400 poles 50 feet long, 55 poles 60 feet long. As soon as these are inspected and shipped we will offer you other poles.           Yours truly,
                  "BERTHOLD & JENNINGS,
                  "C. M. JENNINGS."


And on the seventeenth of September, 1897, the following other letter:


                  "St. Louis, Mo., Sept. 17, 1897.
"St. Louis Electric Construction Co., St. Louis, Missouri.

"Gentlemen: Supplementing our letter of yesterday, we offer for inspection at Cadillac, Michigan, the following poles, and ask you to send inspector at once and inspect them: 600 poles 40 feet long, 350 poles 45 feet long, to apply on your contract with us.           Yours truly,
                  "BERTHOLD & JENNINGS,
                  "H."

And on the eighteenth of September, the following letter:

"Berthold & Jennings, Wholesale Lumber,
"St. Louis, Mo., Sept. 18, 1897.
"St. Louis Electric Construction Co., St. Louis, Missouri.

"Gentlemen: In answer to your favor of seventeenth inst., we beg to say that we offer the poles in our communications of the sixteenth and seventeenth inst., on our contract of June 21, 1897, to which we adhere and are ready to carry out, and ask that the poles be received in accordance therewith.

"If, however, it is desired to make a new contract for the number of poles and at prices mentioned in yours of the seventeenth inst., without waiver on our part of our rights under the contract of June 21, 1897, we will accept your offer to that extent and in accordance with above. Please advise us if satisfactory and when you will send inspector.

"Yours truly,
"BERTHOLD & JENNINGS,
"C. M. JENNINGS."

On the twentieth of September, 1897, plaintiffs made the following offer in writing:

"Berthold & Jennings, Wholesale Lumber,
"St. Louis, Mo., Sept. 20, 1897.
"St. Louis Electric Construction Co., St. Louis, Missouri.

"Gentlemen: Supplementing our letter of September 16, we offer for inspection at Whitney, Menominee county, Michigan, the following poles and ask you to send inspector at once and inspect them: 500 poles 40 feet long, 350 poles 45 feet long, 200 poles 50 feet long, 55 poles 60 feet long, to apply on your contract with us. Please advise us at once.

"Yours truly,
"BERTHOLD & JENNINGS,
"C. M. JENNINGS."

On September 17, 1897, defendant wrote plaintiffs the following:

"St. Louis, Mo., Sept. 17, 1897.

"Messrs. Berthold & Jennings, Chemical Bldg., City.

"Gentlemen: On behalf of the St. Louis Electric Construction Company, I beg to acknowledge receipt by it, of your communications of the sixteenth and seventeenth inst., and to say that the company has not and will not retract anything contained in its communication to you of the thirteenth inst. in regard to your contract with it, but I am instructed to say that while that company has no present need of 500 poles 40 feet long, or any number of poles of that dimension, it will, however, purchase from you 350 poles that you say you have on hand, 45 feet long, and 400 poles 50 feet long, and 55 poles 60 feet long, at the following prices: For 45 foot poles $6.11 each; for 50 foot poles $12.65 each; for 60 foot poles $20.18 each; provided, however, such poles are approved by its inspectors as the best quality straight grained, white cedar poles, free from large or loose knots, checks and twists, and that the poles are straight and well proportioned from top to butt, that the amount of sweep is not more than two per cent of the length of the pole, and is in no case greater than ten inches; such sweep to be measured from the axial line of the pole. Double crooks or bends will cause the rejection of the poles. The bark shall be peeled, and the poles shaved in a workmanlike manner to the distances from the butt specified in the following table. The poles must be free from rot which would impair the strength of the pole. Rot in any other part of the pole than the butt, will cause the rejection of the pole. Knots at the top end of pole, in distances where gains are to be made, must be few, small, and of a character not to impair the strength of the pole. The poles shall be of the following dimensions:

Berthold v. St. Louis Electric Con. Co.

| Length of pole.—Feet. | Minimum circumference at butt.—Inches. | Minimum circumference at top.—Inches. | Length of pole from butt that is not to be shaved.—Feet. |
|---|---|---|---|
| 45 | 47 | 22 | 6.5 |
| 50 | 50 | 22 | 7 |
| 60 | 53 | 22 | 8 |

And provided that the poles, or such of them as pass inspection, are loaded upon cars and are delivered to this company at its yards in the city of St. Louis on or before the fifteenth day of October, 1897, and upon arrival at such yards, are free from damage or injury done in the course of transit. No poles broken or damaged in the course of transit or that are in such condition upon arrival at St. Louis will be accepted. We will send an inspector immediately upon a reply to and acceptance of this proposition.

"Please acknowledge its receipt promptly,

"Yours truly,

"MAXIME REBER,

"Engineer in Charge."

On September 21 defendant wrote plaintiffs:

"St. Louis Electric Construction Co.,

"St. Louis, Mo., Sept. 21, 1897, 10:30 a. m.

"Messrs. Berthold & Jennings, Chemical Bldg., City.

"Gentlemen: Your letter of the twenty-first inst. received at this office at 10 o'clock a. m. has been duly considered. We will not regard that letter as an acceptance of our proposition of the seventeenth inst., and we hereby withdraw that proposition, viz., our letter of the seventeenth inst.

"Yours truly,

"MAXIME REBER,

"Engineer in Charge."

Negotiations having ceased, on the twentieth of November, 1897, plaintiffs brought this action.

The amended petition on which it was tried contains three counts. In the first count they plead the contract, and aver that under it payment for the poles delivered is to be made on the tenth day of each month following the delivery; that pursuant to the contract and in performance thereof, plaintiff shipped and delivered to defendant and the defendant received and accepted from the plaintiffs 1517 poles, the number, and dimensions, and the contract price of which are as follows, to-wit:

| | |
|---|---:|
| 352 poles 35 feet long at $3.74 | $1,316.48 |
| 586 poles 40 feet long at $4.78 | 2,801.08 |
| 383 poles 45 feet long at $6.11 | 2,340.13 |
| 139 poles 50 feet long at $12.65 | 1,758.35 |
| 35 poles 55 feet long at $13.53 | 472.55 |
| 16 poles 60 feet long at $20.18 | 322.88 |
| 6 poles 65 feet long at $25.85 | 155.10 |
| | $9,167.57 |

That said deliveries were made between the twenty-first day of June, 1897, and the thirteenth day of September, 1897, "on which last-named day, the defendant declined and refused to accept any further poles from the plaintiffs, and declined and refused to accept or receive the remainder and residue of the poles, which, under the terms of said contract aforesaid, the plaintiffs were bound to deliver and the defendant was bound to accept. ... And they further aver that for the poles so delivered, defendant became, and since the thirteenth of September, 1897, has been and is indebted to the plaintiffs in the sum of $9,167.57 for which they pray judgment."

In the second count, plaintiffs plead the contract as aforesaid; allege the delivery, prior to September 13, 1897, of the 1,517 poles aforesaid; the refusal of defendant to accept or receive the remainder and residue of said poles; plaintiffs' tend-

der thereof and readiness to furnish and deliver them; and plaintiffs' damages by reason of the breach of said contract in the sum of ten thousand dollars.

The third count was on a *quantum meruit* which need not be set out as it was practically abandoned, and the court, after giving plaintiffs judgment on the first and second counts found for defendant on the third.

The defendant answers each count of the petition, first, by a general denial; second, by pleading the contract *in haec verba* and alleging breaches thereof; and defendant's notice to plaintiffs annulling the contract; and, thirdly, by pleading a counterclaim for damages arising out of the alleged breaches of the contract.

The breaches alleged are the same in answer to each count. Defendant avers that in and by said contract, it was expressly agreed that the said Berthold & Jennings should give their personal attention to the work and not sublet the same, and that failure to comply with said stipulation, or to carry on the work either as to the rate of progress or otherwise, should be deemed a breach of said contract; that in violation of said stipulation, the said Berthold & Jennings did immediately sublet and assign said contract to the Northern Supply Company, and thereafter did fail to give their personal attention to the work undertaken by them, and that in consequence of such violation of said contract and the failure to execute the same according to the rate of progress demanded by the defendant, and for the failure of plaintiffs to comply with other stipulations of said contract, the defendant gave plaintiffs the notice annulling the contract. And furthermore, that by the specifications made part of the contract, it was provided that the delivery of the poles shall begin within sixty days after said twenty-first day of June, 1897, and continue on uninterruptedly and be completed six months after said sixty days. And defendant avers that although plaintiffs began shipping poles in July, they did not continue the delivery thereof uninterruptedly, but for long pe-.

riods of time against the protest and remonstrance of defendant, failed and neglected to deliver any poles whatever, or any of the class demanded and required by defendant, wherefore plaintiffs broke and violated said contract.

And for its counterclaim, defendants say that by reason of the aforesaid several breaches of said contract defendant was compelled to obtain the said poles so agreed to be furnished by plaintiffs, upon the open market at a price greatly in advance of that fixed in the contract, and was put to great expense in obtaining them.

The reply states that the contract set out in full in the answer is the contract declared on in the first and second counts of the petition, and denies each and every allegation of new matter in the answer contained.

The cause was tried by the court without a jury. Plaintiffs offered in evidence the contract of June 21, 1897, and that pursuant thereto they had between July 17 and September 13, 1897, delivered defendant 1,517 poles, which according to the contract price amounted to $9,167.57; that no poles were accepted under said contract from plaintiffs by defendant after September 13, 1897; that by the terms of the contract each month's delivery was to be paid on the tenth of the following month; that on thirteenth of September, 1897, defendant notified plaintiffs it would not receive any more poles or materials under said contract, but elected to annul it; that thereupon plaintiffs in turn notified defendant of their willingness and readiness to carry out their contract and made tender of poles for inspection thereunder, which being refused, they brought this action. Plaintiffs also offered evidence that they sent their confidential clerk, Mr. Hoke, to Fisher, Michigan, twice between June and September to look after the execution of their contract with defendant and they themselves received and delivered the various shipments of poles, and attended to the correspondence with defendant and the Northern Supply Company, with which they had contracted for the furnishing of the

poles. Plaintiffs also gave in evidence their contract with the Northern Supply Company, and introduced evidence tending to show said company was a solvent company and was able and had the poles to furnish plaintiffs to carry out their contract with defendant.

Plaintiffs also offered the evidence of John Clark Kirkpatrick, who testified that he had personal charge of the timber business of the Pittsburg & Lake Superior Iron Company, which in 1897 was and for ten years prior thereto had been engaged in the timber business at Palmer, Michigan. He had seen and examined the contract of Berthold & Jennings and the St. Louis Electric Construction Company of June 21, 1897, and was familiar with the class of poles called for by the specifications. He testified that he knew the market price of such poles in Chicago and St. Louis. The prices fixed by Kirkpatrick, supplemented by the evidence of George A. Warraner as to the cost of shaving the poles, are illustrated by the following tables and a comparison made with the contract prices which plaintiffs were to receive from defendant, as also the difference between the construction company's contract and the Northern Supply Company's contract with plaintiffs:

TABLE I.

Undelivered Poles.

Difference in price between Construction Company Contract and Northern Supply Company Contract.

| Poles | Length. —Feet | Price— Elec. C. Co. | Price—N. Sup. Co. | Difference. Per pole. | Aggregate Difference. |
|---|---|---|---|---|---|
| 1148 | 35 | $ 3.74 | $ 2.90 | $ .84 | $ 964.32 |
| 984 | 40 | 4.78 | 3.70 | 1.00 | 1062.72 |
| 567 | 45 | 6.11 | 4.60 | 1.51 | 856.17 |
| 436 | 50 | 12.65 | 8.25 | 4.40 | 1918.40 |
| 110 | 55 | 13.53 | 10.00 | 3.53 | 388.30 |
| 209 | 60 | 20.18 | 12.50 | 7.68 | 1605.12 |
| 29 | 65 | 25.85 | 15.90 | 9.95 | 288.55 |
| 3483 | | | | | $7083.58 |

TABLE II.

Undelivered Poles.

Difference in Price between Construction Company Contract
and Cost of Furnishing Poles as shown by Testimony
of Kirkpatrick & Warranee Construction
Co. Prices.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1148 poles 35 feet at | $ 3.74 | ............. | $ 4293 52 | | | |
| 984 poles 40 feet at | 4.78 | ............. | 4703 52 | | | |
| 567 poles 45 feet at | 6.11 | ............. | 3464 37 | | | |
| 436 poles 50 feet at | 12.65 | ............. | 5515 40 | | | |
| 110 poles 55 feet at | 13.53 | ............. | 1488 30 | | | |
| 209 poles 60 feet at | 20.18 | ............. | 4217 62 | | | |
| 29 poles 65 feet at | 25.85 | ............. | 749 65 | $ 24,432 38 | | |

As offered by
Pittsburg & Lake Superior Iron Co.

| | | | |
|---|---|---|---|
| 1148 poles 35 feet at | $ 2.75 | ............. | $ 3157 00 |
| 984 poles 40 feet at | 3.50 | ............. | 3444 00 |
| 567 poles 45 feet at | 4.85 | ............. | 2749 95 |
| 436 poles 50 feet at | 7.25 | ............. | 3161 00 |
| 110 poles 55 feet at | 9.50 | ............. | 1045 00 |
| 209 poles 60 feet at | 12.50 | ............. | 2612 50 |
| 29 poles 65 feet at | 16.00 | ............. | 464 00 |

$16,633 45

Shaving:

| | | | | |
|---|---|---|---|---|
| 1148 poles 35 feet at | $0.25 | ..........$287 00 | | |
| 984 poles 40 feet at | .35 | ..........344 40 | | |
| 567 poles 45 feet at | .45 | .........255 15 | | |
| 436 poles 50 feet at | .60 | .........261 60 | | |
| 110 poles 55 feet at | .75 | ..... 82 50 | | |
| 209 poles 60 feet at | 1.00 | .........209 00 | | |
| 29 poles 65 feet at | 1.25 | .........36 25 | $1,475 90 | $18,109 35 |

$ 6,323 03

Mr. Kirkpatrick testified that his company in December,
1897, and January, 1898, furnished Nangle, Holman & Co.,
the poles which the latter furnished to the defendant, to fill the
Berthold & Jennings contract. The poles were billed by his
company from their yard to the St. Louis Electric Construction

Company.    He made a little lower price to Nangle, Holman & Co. than he had figured to Berthold & Jennings.    On the thirteenth of September, 1897, the company of which he was manager had on hand all the poles necessary to fill Berthold & Jennings's contract except a few of the sixty-foot poles.    They were short on them.    On all other lengths they had a full complement to fill the order and figured on buying the balance outside; that they received from Berthold & Jennings an inquiry dated September 14, 1897, asking if they could furnish the poles, if they had them in stock, and could deliver them promptly if they made their quotation on the seventeenth of September, 1897, and quoted the prices on the specifications of their contract with defendant.    That his company had no difficulty in filling the order for Nangle, Holman & Co.    E. C. Norton, defendant's inspector, inspected the poles sold by his company to Nangle, Holman & Co., and shipped to defendant.

Mr. Maxime Reber testified that defendant, after September 13, 1897, purchased of Nangle, Holman & Co., the poles with which to fill plaintiffs' contract with defendant at the same prices the defendant was to pay plaintiffs.

On the part of defendant, testimony was introduced to show that the plaintiffs did not fill the orders for the poles as rapidly as ordered; that their inspectors reported that the Northern Supply Company did not have the poles of the proper dimensions, and an effort to show that the Northern Supply Company expected to fill the contract with poles inferior to the specifications of plaintiffs' contract with defendant; that plaintiffs did not give their personal attention to the filling of the contract, and that on account of the delay defendant annulled the contract.

At the conclusion of all the evidence the court gave five declarations of law at the request of plaintiffs, as follows:

"1.    By the contract in writing given in evidence by the plaintiffs and set out in the answer, the plaintiffs agreed to sell and deliver to the defendant and the defendant agreed to buy

and receive from the plaintiffs, between the twenty-first day of June, 1897, and the twenty-first day of February, 1898, poles of the dimensions and approximate number following, to-wit:

"1570  poles  35  feet  long;
"1570  poles  40  feet  long;
 "950  poles  45  feet  long;
 "575  poles  50  feet  long;
 "145  poles  55  feet  long;
 "225  poles  60  feet  long;
  "35  poles  65  feet  long;

"And for which said poles, the said defendant promised and agreed to pay plaintiffs:

"For  each  pole  35  feet  long................$  3  74
"For  each  pole  40  feet  long.................   4  78
"For  each  pole  45  feet  long.................   6  11
"For  each  pole  50  feet  long................  12  65
"For  each  pole  55  feet  long................  13  53
"For  each  pole  60  feet  long................  20  18
"For  each  pole  65  feet  long................  25  85

"If the court sitting as a jury find from the evidence that the plaintiffs, under said contract, furnished and delivered to the defendant, and the latter received and accepted, the poles mentioned in the first count of the petition or any of them, then the defendant is liable to the plaintiffs for the contract price of the poles so delivered, received and accepted, and the court sitting as a jury will find for the plaintiffs on said first count for the aggregate amount of poles so delivered, received and accepted with interest thereon from the tenth day of the month next after the last delivery, that is, October 10, 1897, unless the court finds for the defendant, upon its counterclaim, under the other instructions of the court.

"2.  If the court sitting as a jury believe from the evidence that the plaintiffs, under the written contract given in

evidence by them, delivered to the defendant, and the latter accepted, a portion of the poles provided for by said contract; that the defendant addressed and delivered to the plaintiffs the letter of September 13, 1897, given in evidence by plaintiffs, and that defendant thereafter declined and refused to receive and accept the remainder of the poles specified in said contract, and that plaintiffs were able and willing to furnish them, then the plaintiffs are entitled to recover on the second count of the petition, the difference between the contract price of the remainder of said poles, and the amount it would have cost the plaintiffs to furnish and deliver them to the defendant within the time and at the place mentioned in the contract, and the verdict must be for the plaintiffs for such difference, unless the jury find from the evidence that plaintiffs failed to perform said contract on their part as defined by the other instructions in this cause.

"3. There is no evidence that the plaintiffs assigned or sublet the contract recited in the pleadings, and the court sitting as a jury will disregard the defense based on said charge.

"4. The contract on which this action is founded is dated June 21, 1897. Under and by its terms the delivery of the poles was to begin sixty days after that date and was to be completed on the twenty-first day of February, 1898. The right of the Electric Company to annul the contract in case the party of the second part 'shall fail to carry out the work with a satisfactory rate of progress' is not an arbitrary right on the part of the defendant to annul the contract, but is a right which is to be construed with reference to the period which the contract gives the party of the second part to complete it and means such a rate of progress as a reasonable man, taking into consideration the conditions and circumstances in which the parties to this contract were placed, would regard as a satisfactory rate of progress in the delivery of the poles.

"6. Under the evidence in this cause on the defendant's counterclaim to the several counts of the petition must be for

the plaintiffs and against defendant."

The court found for the plaintiffs on the first and second counts, and on defendant's counterclaim, and for the defendant on the third count. The finding on the first count was the contract price for 1,517 poles or $9,167.57, and interest to date of judgment, making $9,720.51, and on the second count for $6,323,03, the damages sustained by plaintiffs by the breach of the contract as to the undelivered poles, and gave judgment for plaintiffs for $16,043.54 in the aggregate, and for costs. In due time motions for new trial and in arrest were filed, heard, and overruled, and defendant appealed.

Numerous points are urged for reversal of the judgment and they will be examined and determined in the order of defendant's brief.

I. The first declaration of law is assailed because counsel say it permits a recovery of the contract without requiring a performance thereof by plaintiff.

We are unable to appreciate the point of this criticism. The declaration of law in express terms requires the court to find from the evidence that the plaintiff's under said contract, furnished and delivered to defendant and the latter received and accepted the poles mentioned in the first count or any part of them, before defendant was liable for the contract price of the poles so delivered and accepted under the contract. The contract bound defendant to pay for these poles on the tenth of each succeeding month after their delivery, and it was expressly ruled in Bean v. Miller, 69 Mo. 384, that where work is done under a contract which provides for the payment by installments as this contract did, if the party who agrees to pay by installments fails to pay, the other party may quit the work and recover for all he has done at contract rates.

The objection that the same qualifying clause was not appended to this declaration of law as was added to the ninth instruction in Bean v. Miller, supra, can not avail because the fact that defendant had refused to permit plaintiffs to perform

the contract was alleged by plaintiffs and affirmatively reiterated in the answer.   As this cause was tried by the court he was not required to submit to himself the finding of a fact which stood conceded by the pleadings.     There is no ground for complaint as to this declaration.    This declaration was a necessary deduction from his finding that defendant without just cause had assumed to abrogate the contract.

If one party to a contract while engaged in executing the same is notified by the other party that he has annulled and repudiated the contract and will not longer abide by it, the first party may stop, and without tendering, as plaintiffs did in this case, further performance of the contract, bring his action to recover the contract price for the work performed or goods furnished, and for his damages for the difference between the contract price and what it would have cost to perform the uncompleted part.    [Black River Lumber Co. v. Warner, 93 Mo. 374; Gabriel v. Brick Co., 57 Mo. App. 520; Chapman v. Railroad, 146 Mo. 493-4.]

But the circuit court as a trier of the facts having found from the evidence that defendant had no sufficient cause to annul the contract, and the whole evidence having shown that the plaintiffs had delivered and the defendant had inspected, received and accepted 1,517 poles under the contract, plaintiffs' right to recover the contract price therefor, in the absence of damages suffered by defendant for a breach of the contract, is so clear that even if the declaration of law was defective it would not work a reversal of this judgment. [Yeats v. Ballentine, 56 Mo. 530.]   The defendants having received and accepted these poles under the contract could not, with any consistency, insist they were not worth the contract price, and that they could retain them without paying for them.

II.    The objection to the second declaration of law seems to be that plaintiffs were not thereby required to tender the remaining poles at St. Louis.   By reading the declarations of law it will be observed that it is predicated upon the refusal of

defendant on the thirteenth of September, 1897, to receive and accept the remainder of the poles and the further controlling fact that the court should find that plaintiffs had not failed to comply with their contract as defined in the declarations three and four with which it must be read.  And what was tantamount to a compliance with their contract was the unqualified annulment thereof by defendant and a refusal to permit them to perform their part without reasonable cause.

As has already been said, when defendant positively and unequivocally notified plaintiffs, it would no longer abide by the contract, it was not necessary, as defendant claims, for them to go on getting out the poles and shipping them to St. Louis, and actually tender them for inspection and acceptance there, but they were justified in stopping and suing for the poles delivered, and for the breach as to the undelivered poles. [Chapman v. Railroad, 146 Mo. 494; Black River Lumber Co. v. Warner, 93 Mo. 374; Gabriel v. Brick Co., 57 Mo. App. 526.]

In Cort v. Railroad, 17 A. & E. (Q. B.) 127 (79 Eng. Com. L. Reports), it appeared that the plaintiffs contracted with the defendant company to supply it with 3,900 tons of railway chairs at a certain price, to be delivered in stated quantities at certain dates.  After 1,787 tons had been delivered the defendants gave notice that they would not receive any more as they were not needed.  Action was brought on the contract, plaintiffs averring their readiness and willingness to perform their part, and that they had been prevented from so doing by the company.  They obtained a verdict, but defendant asked a new trial on the ground that the plaintiffs should have proved not merely readiness and willingness to deliver, but an actual delivery of the chairs.  But the court of Queen's Bench held the plaintiffs were entitled to maintain the action, using this language:  "Where there is an executory contract for the manufacturing and supply of goods from time

Vol 165 mo—20

to time, to be paid for after delivery, if the purchaser, having accepted and paid for a portion of the goods contracted for, gives notice to the vendor not to manufacture any more, as he has no occasion for them and will not accept or pay for them, the vendor having been desirous and able to complete the contract, he may, without manufacturing or tendering the rest of the goods, maintain an action against the purchaser for breach of contract."

In Hosmer v. Wilson, 7 Mich. 294, the Supreme Court of Michigan said in response to a claim that an unqualified refusal was not enough, but the vendor must make a tender, "We think it was, and that such absolute refusal is to be considered in the same light, as respects the plaintiffs' remedy, as an absolute, physical prevention by the defendants." [Derby v. Johnson, 21 Vt. 17; Clement Mfg. Co. v. Meserole, 107 Mass. 362.]

And as was said in Black River Lumber Co. v. Warner, 93 Mo. 388, "An absolute refusal to have the lumber inspected, and to receive the same, dispensed with the tender at St. Louis."

No error was committed in giving this instruction or declaration, and it follows no error occurred in refusing declaration eight asked by defendant as no tender was necessary after its absolute refusal to carry out the contract.

III. The court, under the facts in evidence, very properly declared there was no evidence that plaintiffs had sublet or assigned their contract. Their contract with the Northern Supply Company to furnish them the poles which they had agreed to furnish defendant was in no sense an assignment or subletting. This character of poles were only to be had in Michigan, Minnesota or Wisconsin. By their contract they were simply providing themselves the means to fulfill their contract. There is little to commend in the claim of defendant that it was justified in annulling its contract with plaintiffs on the ground that they had sublet the contract. This provision in the contract refers to work, whereas this was a contract of

sale of materials, but conceding it has any application to the facts in issue, from July 2, 1897, defendant knew plaintiffs were obtaining these poles from the supply company, sent their inspector there and left their order with that company instead of giving it to plaintiffs, and received 1,517 poles from the supply company without an intimation that it considered this a breach of the contract, which in fact and law it clearly was not. The contract shows on its face that defendant reserved the right of two inspections, one at the northern yard and a final one at St. Louis. It was relying on its own inspection and not on the skill and personal labors of plaintiffs to secure the character of poles for which they had bargained. But there was no subletting or assignment and the court was right in so declaring.

IV. The next insistence is that the circuit court erred in giving the fifth declaration asked by plaintiffs and refused the fifth asked by defendant. The latter is in these words:

"5. The contract declared upon by the plaintiffs in this case gave to the defendant the right to annul the same whenever the plaintiffs failed to carry out the work with satisfactory rate of progress. If the plaintiffs failed to furnish the poles under said contract with a satisfactory rate of progress and the defendant in good faith under an honest sense of dissatisfaction annulled the contract because of the unsatisfactory rate of progress in the delivery of said poles then the plaintiffs are not entitled to recover upon or for a breach of said contract."

These two declarations present the substantial point of difference between these parties. That they held radically different views as to the proper construction of its stipulations is readily seen from the correspondence between the parties. From the letters of the officers of defendant they seem to have been of opinion that it was the duty of plaintiffs to furnish as they ordered all the poles without reference to the six-months time which was given in which to complete the delivery of the poles.

This contention plaintiffs opposed, and insisted they were to have a reasonable time to furnish the poles so that they did not unreasonably delay the delivery and that by mutual stipulation all the poles should be delivered in six months.

Both parties must be brought to book and the contract must be read in the light of the circumstances surrounding the parties, when it was made, and the objects in view. It will be observed that the contract nowhere stipulates exactly how many poles shall be delivered at any intermediate time, or in any one month. The language is: "It is hereby mutually agreed and expressly understood that the said party of the first part shall have the right to suspend the execution of this contract, and to annul the same whenever the said party of the second part shall fail to carry out the work with a satisfactory rate of progress or comply with all and singular the terms and stipulations herein set forth, and that such suspension or annulment shall not affect the right of the party of the first part to recover any of the damages resulting from such failure."

The contract further provided that "the delivery shall begin within sixty days after the award of the contract, and continue uninterruptedly and be completed six months after said sixty days."

The circuit court construed the provision as to satisfactory progress in its fourth declaration as follows:

"4. The contract on which this action is founded is dated June 21, 1897. Under and by its terms, the delivery of poles was to begin within sixty days after that date and was to be completed on the twenty-first day of February, 1898. The right of the electric company to annul the contract, in case the party of the second part shall fail to carry out the work with a satisfactory rate of progress, is not an arbitrary right on the part of the defendant to annul the contract, but is a right which is to be construed with reference to the period which the contract gives the party of the second part to complete it, and means such a rate of progress as a reasonable man, taking into

consideration the conditions and circumstances in which the parties to this contract were placed, would regard as a satisfactory rate of progress in the delivery of the poles."

This declaration is not open to the criticism made upon it by defendant, viz., that it asserts the duty of plaintiffs would be performed if they began the delivery within sixty days after June 21, 1897, and completed the deliveries by February 21, 1898, without reference to the other words of the contract, to-wit, "continue uninterruptedly" and "with a satisfactory rate of progress." On the contrary the court declares that the plaintiffs must have made "such a rate of progress as a reasonable man, taking into consideration the condition and circumstances in which the parties to this contract were placed would regard as a satisfactory rate of progress in the delivery of the poles."

The exact formula, "satisfactory rate of progress," does not appear in any case to which we are cited by the learned counsel. Counsel for defendant cite an English case, Stadhard v. Lee, 9 Jurist (N. S.) 908, in which the words were, "if the works did not proceed as rapidly and satisfactorily as required by defendants or their agents, they should have power [not to annul the contract, but] to enter thereupon and pay whatever number of men should be left unpaid and set to work whatever number they thought necessary and deduct the amount so paid from whatever might be due plaintiffs," and the Queen's Bench held that the defendants, with or without sufficient reason, might employ the additional hands. But in that case it was left entirely to defendants to determine whether the work was moving as rapidly as they desired.

But substantially similar contracts have often been construed by the courts of this country and a different conclusion reached.

Thus, in Duplex Safety Boiler Company v. Garden, 101 N. Y. 387, the parties entered into a contract by which plaintiff agreed to alter certain boilers belonging to defendants in

a manner specified and the stipulated price defendants agreed to pay as soon as they "were satisfied that the boilers as changed are a success." In an action for the price, defendants claimed that whether the work was a success was for them alone to determine and it was held untenable. "Under such a contract, that which the law will say a contracting party ought in reason to be satisfied with, that it will say he is satisfied with." The court recognized that a different rule prevailed where the object was to gratify taste, serve personal convenience or satisfy individual preference. [Folliard v. Wallace, 2 Johns. 395; City of Brooklyn v. Railroad, 47 N. Y. 475; Miesell v. Ins. Co., 76 N. Y. 117; Daggett v. Johnson, 49 Vt. 345.]

All the cases on this subject were reviewed by BURGESS, J., in Mullally v. Greenwood, 127 Mo. 138, in which an agreement to pay commissions for negotiating "a satisfactory lease" came before us, and it was held that the lessors could not arbitrarily refuse to accept a lease negotiated, saying, "it was their duty to act fairly and honestly, and in accordance with the reasonable expectations of the plaintiff, as implied from the contract, its subject-matter, and the facts and circumstances surrounding its execution, its nature, object and purpose." [Pope Iron & Metal Co. v. Best, 14 Mo. App. 502.]

In view of these authorities and the nature of this contract, an ordinary contract for materials, we think the court properly construed it as requiring that reasonable progress which a reasonable man under like circumstances would regard as a satisfactory rate of progress, and not an arbitrary right by defendant to annul the contract whenever it saw fit without regard to the other stipulations in the contract, or to the rights of plaintiffs. As said by DANFORTH, J., in Duplex Co. v. Garden, supra, "it can not be presumed that the plaintiff entered upon its work with this understanding, nor that defendants, supposed they were to be the sole judges in their own cause."

The circuit court laid down for itself, as trier of the fact,

the rule that plaintiffs must have made satisfactory progress in the delivery of the poles, and it evidently found that they did and having so found, necessarily found defendant unreasonably refused to allow plaintiffs to complete the delivery and were liable for the damages occasioned by their conduct. What was satisfactory progress under the contract was peculiarly a question of fact. If the defendant had intended to insist on deliveries at specific times and in certain quantities, it should have so specified in the contract, but it did not. The court has found as a fact that it had no reasonable cause to annul the contract, and in the absence of error in its declarations or in the admission or rejection of testimony its finding is conclusive in this action at law. And in view of the fact that under the contract plaintiffs were not bound to begin their delivery until August 20, 1897, and that the defendant annulled the contract within twenty-four days thereafter, it certainly can not be said that the court's finding was without support in the evidence.

V. The sixth instruction which merely declared that under the evidence the court's finding would be for plaintiffs on the defendants' counterclaim presents no question of law for review, and does not seem to be seriously pressed by defendant. In view of the fact that it bought poles of the identical specifications for the same price from Nangle, Holman & Company and within the time fixed by its contract, the finding could not have been otherwise.

VI. The measure of damages as we have already said, was the difference between the contract price and the amount it would have cost plaintiffs to furnish and deliver the poles, under the contract. This contract falls in the same class with that construed in Chapman v. Railroad, 146 Mo. 481, which was a contract for getting out and delivering cross-ties. The evidence shows that poles of this kind are not carried in stock in St. Louis where the contract was to be performed. They must be obtained in Michigan, Wisconsin or Minnesota. There they are cut by timber companies and when the poles are se-

lected must be trimmed and prepared for use. The evidence further showed their value was arrived at by their price at the log-camp plus the transportation plus the cost of trimming. But the evidence shows quite clearly that the court adopted the real market value, which included the items of cost above mentioned, and no error can be predicated on its finding as to the amount of the damages suffered.

VII. A point is made that the approval and acceptance by the chief engineer was a condition precedent to any recovery. As to the 1,517 poles they were inspected, received and accepted by the engineer and the proof is conclusive that they met the requirements of the contract, and as to the remainder his approval was made unnecessary by defendants' refusal to inspect or receive the poles.

VIII. There are several other assignments which we have examined and considered, and find no reversible error in any one or all of them, and it is unnecessary to extend this opinion to any greater length.

The judgment must be and is affirmed. All concur.