(59 South. 113.)

No. 18,799.

CHAS. E. & W. F. PECK, Limited, v. SOUTHWESTERN LUMBER & EXPORTING CO.

(April 8, 1912.    Rehearing Denied June 29, 1912.)

*(Syllabus by Editorial Staff.)*

1. CORPORATIONS (§ 560*) — RECEIVERS — BREACH OF CONTRACT—DEMAND.

Under an order appointing a receiver for a corporation with power to manage and dispose of the property and income of the corporation, he was the proper person to fulfill the corporate contracts, and a demand on the dispossessed officers of the corporation to comply with the contract was not essential to an action against the receiver for breach.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2253–2260, 2262; Dec. Dig. § 560.*]

2. CORPORATIONS (§ 559*) — RECEIVERS — APPOINTMENT—EFFECT ON CONTRACTS.

While the receiver of a corporation need not adopt its contracts in the sense of making them his own, so that any debt accruing therefrom would be a debt of the receivership as distinguished from a debt of the corporation, and as such entitled to preferred payment, and while his appointment may defeat specific performance, it does not affect the corporation's liability for breach of the contract; and hence a corporation's contract to buy lumber was not obviated by the receivership proceedings against it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2241–2252, 2259; Dec. Dig. § 559.*]

3. SALES (§ 339*) — SALES OF LUMBER — BREACH BY BUYER—DAMAGES—MEASURE.

On a breach of a corporation's contract to buy lumber manufactured by intervener, the latter is entitled to the difference between the contract price and the lower price at which the lumber was resold, though it was not resold at once; intervener waiting until it could obtain a purchaser to the best advantage.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 924, 926; Dec. Dig. § 339.*]

Appeal from Civil District Court, Parish of Orleans; W. B. Sommerville, Judge.

Action by Chas. E. and W. F. Peck, Limited, against the Southwestern Lumber & Exporting Company; the Sabine Tram Company intervening. Judgment for intervener, and defendant appeals. Modified and affirmed.

McCloskey & Benedict and Frank W. Hart, for appellant Southwestern Lumber & Exporting Co. Howe, Fenner, Spencer & Cocke and Esmond Phelps, for appellee Sabine Tram Co.

PROVOSTY, J. The present suit is against the receiver of the Southwestern Lumber & Exporting Company, and has been brought by way of an intervention in the receivership proceedings of the said company. The intervener is the Sabine Tram Company. It and said Lumber Company entered into certain contracts by which it was to manufacture and deliver, and said company was to receive and pay for, certain lumber, at dates and prices and of grades specified in said contracts. After the contracts had been partially carried out, the Lumber Company applied for and obtained, as a favor, a suspension of deliveries for 60 days, and, before the expiration of this delay, was put in the hands of a receiver at the suit of a creditor, without opposition on its part. The receiver refused to go on with the contracts, assigning as his reason that under the terms of the order appointing him he was without authority to do so. The intervener insisted upon the contracts being carried out, and duly put the receiver in default, and after having, in due course of business, disposed of all the lumber called for by the contracts, brought this suit to recover as damages the differ-

ence between the price obtained for the lumber and the contract price.

Judgment is asked in solido against the corporation and the receiver.

[1] Defendant contends that, as against the corporation, the petition of intervention does not show a cause of action, because it does not contain an allegation that the corporation was put in default, but only the receiver.

The receiver by the order appointing him was given "full power to hold, administer, manage and dispose of the property and income of said corporation." This made him the proper person to be called upon to fulfill the contracts. To have called upon the dispossessed officers of the corporation to do so would have been the doing of a vain thing.

[2] Defendant next contends that the receiver of a corporation is not bound to adopt the executory contracts of the corporation if in his opinion it would be unprofitable or undesirable to do so, and that any loss of profits which the other party to the contract may thereby suffer is damnum absque injuria, especially where, as in the present case, the failure to carry out the contract is due to the act of the court in withholding from the receiver authority to continue the business of the corporation.

No doubt the receiver is not bound to adopt the contracts of the corporation in the sense of making them his own in such a way that any debt that might accrue from them would be a debt of the receivership (as contradistinguished from a debt of the corporation), and as such entitled to preferred payment out of the assets of the receivership, and it is also true that by the appointment of a receiver a situation may be created wherein enforcement of specific performance may become impossible; but it does not follow from this that the obligation of a contract may be destroyed by the appointment of a receiver. Under the operation of fa-

miliar principles, the obligation of the contract resolves itself into a money debt, or so-called damages, that is all. And such a debt is a perfectly valid, binding debt, as much so as any promissory note or bond; and it would be as reasonable to contend that by the appointment of a receiver the promissory notes or bonds of a corporation were vacated, converted into damnum absque injuria, as to contend that such a debt for damages was thus nullified. True, the amount of such debt is not yet fixed or certain; but in law id certum est quod certum reddi potest.

The familiar principles here alluded to are embodied in our Code, but are of universal jurisprudence, and hence would be practically of the same authority, even though not so embodied. They are (article 433) that "corporations may make valid contracts, obligate others and obligate themselves towards others"; that (article 3182) "whoever has bound himself personally, is obliged to fulfill his engagements out of all his property, movable and immovable, present and future"; that (article 3183) "the property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful cause of preference"; that (article 1968) "there is a right implied in all obligations, to wit: That the property of the debtor shall be liable for all consequences attending their non-performance"; that (article 1930) the party who violates his contract "is liable as one of the incidents of his obligation, to the payment of the damages which the other party has sustained by his default"; that (article 1901) "agreements legally entered into have the effects of laws on those who have formed them, and cannot be revoked, unless by the mutual consent of parties, or for causes acknowledged by law." From these principles the forced conclusion is that the property of the corporation continues to be bound after the cor-

poration has been incapacitated by the appointment of a receiver from carrying out its contract; and we know of no law, statutory or other, that stays the operation of these principles.

To that effect are the English decisions. 51 L. R. A. 146, note.

It has to be admitted, however, that the weight of authority at common law in this country is the other way. Malcomson v. Wappo Mills (C. C.) 88 Fed. 680; Eddy v. Co-Operative Dress Ass'n, 3 Civ. Proc. R. (N. Y.) 442; People v. Globe Mut. L. Ins. Co., 91 N. Y. 174; Tennis Bros. Co. v. Wetzel (C. C.) 140 Fed. 193; Lenoir v. Linville Imp. Co., 126 N. C. 922, 36 S. E. 185, 51 L. R. A. 146. Contra, Bolles v. Crescent Drug & Chemical Co., 53 N. J. Eq. 614, 32 Atl. 1061. Other cases are cited in the brief of the plaintiff, namely, Broughton v. Pensacola, 93 U. S. 268, 23 L. Ed. 896; Curran v. Arkansas, 15 How. 310, 14 L. Ed. 705; Chemical Nat. Bank v. Hartford Deposit Co., 161 U. S. 1, 16 Sup. Ct. 439, 40 L. Ed. 595; Wolf v. National Bank of Ill., 178 Ill. 85, 52 N. E. 896; McGraw v. Western Union Tel. Co., 135 Mich. 609, 98 N. W. 390; People v. St. Nicholas Bank, 151 N. Y. 592, 45 N. E. 1129; In re Reading Iron Works, 150 Pa. 369, 24 Atl. 617. But these cases are not in point, either because they did not involve receiverships, or because the receiverships involved in them were voluntary. Between a voluntary and a forced receivership, a broad distinction must be recognized in the present connection, even though the forced receivership should have been unopposed, as in the present case. In a voluntary receivership the corporation is clearly not in a position to say that its not carrying out the contract was not due to its own voluntary act; whereas, in a forced receivership it may with plausibility say that its default was due to the action of the law or to the act of the court; merely with plausibility, however, and not in reality, be-

cause, in such a case, the corporation is responsible for the interference of the court, so that, in reality, or in final analysis, the act of the court is the act of the corporation itself. The corporation is responsible for the interference of the court because its own acts of commission or omission, its own conduct, its mismanagement, intentional or unintentional, of its own affairs, has rendered the interference of the court necessary.

The reasoning by which the doctrine of nonliability is sustained is found in People v. Globe Mut. L. Ins. Co., supra, which is the leading case on the subject, and is as follows:

"There was no breach of the contract between Mix and the insurance company by either of the parties. It was in process of continued performance according to its terms, and was unbroken at the moment when the injunction order was served. That operated upon both parties at the same instant, and perpetuated the then existing rights and conditions. Before the service, the company had done nothing to prevent performance, and was we must assume both ready and able to perform. It had done no act which amounted to a refusal, or which made it unable to carry out its contract. For aught that appears, it would have done so if left alone. But it was not permitted to perform. The state, by the injunction order operating alike upon the company and its agents, paralyzed the action of both the contracting parties, so that neither could perform, or put the other in the wrong. Therefore the company could not refuse, and did not refuse. To put it in the wrong, and make it liable for a breach, required action on the part of Mix. As a condition precedent, he was bound to show both ability and readiness to perform his part. * * * He could do neither. Performance by him had become illegal. It would have been a criminal contempt, and possibly a misdemeanor. There could be neither readiness nor ability to do the forbidden and unlawful acts. * * * So that from the necessity of the case, as there was no breach on either side before the injunction, so there could be none after. What had happened was a dissolution of the contract by the sovereign power of the state, rendering performance on either side impossible, and this result was within the contemplation of the parties, and must be deemed an unexpressed condition of their agreement. One party was a corporation. It drew its vitality from the grant of the state, and could live only by its permission. It existed within certain defined limitations, and must die whenever its creator so willed. The

general agent who had contracted with it did so with knowledge of the statutory conditions, and these must be deemed to have permeated the agreement, and constitute elements of the obligation."

This reasoning, in so far as based upon the statement that "this result was within the contemplation of the parties, and must be deemed an unexpressed condition of their agreement," assumes a premise which if granted puts an end to all discussion, namely, that the parties contemplated that the appointment of a receiver should put an end to their contract. But we do not see why it should be said that they so contemplated. True, they knew that a receiver might be appointed; but they did not know that such appointment would have the effect of destroying the obligation of the contract. There was no law providing that it should; and there was no reason why it should, since the property of the corporation would still remain to answer in damages for the non-execution of the contract. The courts of England have not found any reason why the obligation of the contract should not continue in full force. Of course, if the law provided that, upon the appointment of a receiver, all contracts of the corporation should be terminated, the legal situation would be different. Such a law would be read into the contract as one of its conditions. The statutes in this state which forbid insurance companies from doing any further business after the appointment of a receiver or liquidator, might perhaps have such an operation. The argument that the intervention of the court, or, in other words, of the "sovereign power," operates as vis major, loses sight of the fact that such intervention is the necessary consequence of the acts of the corporation itself in provoking the appointment of a receiver by the mismanagement of its affairs. A court of justice cannot act until the party to be affected by its action has given it cause. The intervention of the court in such a case is the mere effect of the cause for which the corporation is responsible. It stands to reason that a corporation cannot as an effect of its own acts of omission or commission, its own mismanagement, secure a release from the obligation of its contracts. If corporations could be thus relieved from their contracts, they would stand with reference to the obligation of their contracts in a much more favored position than ordinary persons.

[3] Passing to the merits of the case, we find that at the time the contracts were breached there was a certain quantity of the lumber already manufactured, and that the intervener sold this lumber as soon as it could obtain a purchaser, and to the best advantage; that intervener did not proceed at once to manufacture all that part of the lumber which at the date of the breach of the contract had not yet been manufactured, but waited to do so until it could secure orders for the lumber; that two years elapsed before all of the lumber called for by the contracts could be disposed of in this manner; and that during those two years the market kept going down all the time.

Plaintiff, as already stated, sues for the difference between the price at which the lumber was sold and the contract price.

Defendant contends that the proper measure of the damages is the difference between contract price and market price at the time the contracts were breached, or, at any rate, at the time fixed by the contracts for delivery, and that by adopting this standard the amount of the damages would be greatly reduced, since the market was falling all the time, and the greater part of the lumber was already manufactured and on hand ready for market at the date of the breach of the contracts, and that, as to the manufactured part, the contract called for its early manufacture and delivery.

To this the intervener replies that the lum-

ber which was already manufactured was export lumber for which there was no market, and that it disposed of this lumber as soon as it could and to the best advantage, and that the very best proof of what the market price for this lumber was is the price that was in fact obtained for it; that, as to that part of the lumber not yet manufactured at the date of the breach of the contract, the proper measure of damages is not the difference between contract price and market price, but the difference between contract price and cost of performance; and that, if measured by the latter standard, the loss would be greater than the amount now being demanded of the defendant. In other words, that the lumber was not manufactured and sold at a loss but at a profit, and that this profit has gone towards reducing the damages for which the defendant would have been liable if the intervener, instead of manufacturing and selling the lumber, had sued at once for the difference between the contract price and what it would cost to manufacture and deliver the lumber.

Only one witness was examined in the case, and he was the manager of the plaintiff company. His testimony bears out the contention of plaintiff as to the depressed condition of the lumber market and the impossibility of disposing of the lumber to better advantage than was done, and as to the course which was pursued having resulted in a profit, and not a loss, and of having therefore benefited the defendant.

The proper measure of damages in the case of a contract of manufacture and sale where the breach has been on the part of the vendee is, as stated by plaintiff, the difference between contract price and cost of performance. 24 A. & E. E. 1116; Hinckley v. Bessemer Steel Co., 121 U. S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Williams v. Crosby Lumber Co., 118 N. C. 928, 24 S.

E. 801; Sabine Tram Co. v. Jones (Tex. Civ. App.) 43 S. W. 905; Berthold v. St. Louis Electric Co., 165 Mo. 280, 65 S. W. 784; Black River Lumber Co. v. Warner, 93 Mo. 374, 6 S. W. 210; Cameron v. White, 74 Wis. 425, 43 N. W. 155, 5 L. R. A. 495. There is nothing opposed to this in the decisions in Masterton v. City of Brooklyn, 7 Hill (N. Y.) 62, 42 Am. Dec. 38; Seaton v. Second Municipality, 3 La. Ann. 44; Jochams v. Ong, 45 La. Ann. 1289, 14 South. 247.

The plaintiff has claimed only the amount of the loss shown to have been actually suffered; and is entitled to judgment accordingly.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be increased to the full amount claimed, namely, $18,597.15, and that as thus amended the said judgment be affirmed, defendant to pay the costs of appeal.