**Mildred K. DIEHR, Administratrix of the Estate of Adolph H. Winheim, Deceased, Plaintiff-Respondent,**

v.

**THOMPSON CHEMICALS CORPORATION, Defendant-Appellant.**

No. 29062.

St. Louis Court of Appeals. Missouri.

July 19, 1955.

Motion for Rehearing or for Transfer to Supreme Court Denied Sept. 9, 1955.

Champ C. Stonebraker, St. Louis, for appellant.

Bertram W. Tremayne, Jr., and Ralph R. Neuhoff, Jr., St. Louis, Ralph R. Neuhoff, Neuhoff, Tremayne & Schaefer, St. Louis, of counsel, for respondent.

SAM C. BLAIR, Special Judge.

Adolph H. Winheim was sole proprietor and operator of Planetary Chemical Company. He processed chemicals and produced chemical mixtures. Some processes were beyond the facilities of his plant. For one of these he relied on Thompson Chemicals Corporation. Its president was William T. Thompson. Winheim and Thompson orally agreed that Winheim would deliver to Thompson's company quantities of acid and alcohol which that company would process for him. Processing was to be done only when Winheim ordered it, not before, and then only in the quantities he specified. The processed chemicals were to be returned to Winheim in metal drums furnished Thompson's company by Winheim for that purpose. Large quantities of the two chemicals were delivered by Winheim. At intervals Winheim ordered specified quantities of these chemicals processed and returned to him. This was done as ordered.

Winheim died on June 3, 1950. His wife, Mildred K. Winheim, now Mildred K. Diehr, took over and operated Planetary Chemical Company as executrix. She tried to settle the accounts between Planetary and the Thompson company. There were differences of opinion regarding the mutual obligations of the two companies. Finally, on October 6, 1950, her attorneys wrote the Thompson company reciting the quantities of Planetary's acid and alcohol, and the number of its metal drums, which the executrix claimed were in the possession of the Thompson company on August 31, 1950. The letter proposed arrangements for securing the return of the acid, alcohol, and drums to Planetary. It acknowledged that Planetary owed the Thompson company $4,692 on August 31, 1950. It offered to pay this sum promptly. It requested confirmation of these recitals of mutual obligations and acceptance of the proposed arrangements for return of the chemicals and drums.[1] William T. Thompson, for his company, by endorsement on the bottom of the letter, confirmed the accounts and accepted the proposed arrangements.[2] Then

1. "Dear Mr. Thompson: This letter will confirm our conversation of this morning in which we agreed with you upon the status of the accounts between your company and Planetary Chemical Company as of June 3, 1950, and as of August 31, 1950. * * * As of August 31, 1950, you had on hand the following assets belonging to Planetary Chemical Company: 13,269 pounds of 2, 4D Acid; 3,455 gallons of 99% Isopropyl Alcohol; 76 reconditioned drums. As of August 31, 1950, Planetary Chemical Company owed you $4,692.00. This will be paid promptly. Mr. Kaberg will send someone soon to pick up the 13,269 pounds of acid; and you agreed that you would promptly transfer the alcohol, which is now on hand in tanks, into the drums now owned by Planetary Chemical Company and in your possession; and as soon as this is done Mr. Kaberg will send someone to pick up the drums of alcohol and the remaining reconditioned drums not needed for the alcohol. As we mentioned to you in our conversation, the accounts of Planetary Chemical Company are being audited by Ernst & Ernst, * * * and they desire a direct confirmation of the status of the accounts between your firm and Planetary * * * as of the dates referred to in this letter. Accordingly, would you please sign and forward directly to Messrs. Ernst & Ernst the enclosed carbon copy of this letter."

2. The information outlined above with reference to the status of our accounts with Planetary Chemical Company as of June 3, 1950, and August 31, 1950, is correct and we agree to proceed as stated above.

he returned the letter and endorsement, as he had been requested, to Planetary's accountants.

The agreement expressed by the letter and endorsement did not bring the results it contemplated. Delays and disputes arose and lasted for almost a year. Then the Thompson company refused to perform unless the executrix agreed to conditions it tried to add to the agreement. The executrix then sued the Thompson company for conversion of the acid, alcohol, and drums. She claimed $10,363.22 as the value of this property. She acknowledged the indebtedness of Winheim's estate to the Thompson company to be $4,692 as had been agreed. Her prayer was for the balance, $5,671.22. The Thompson company answered by denying the conversion and all other averments of the petition. It counterclaimed. It agreed the estate owed it $4,692 for chemicals processed for Planetary as stated in the petition and in the letter agreement. But it also claimed an additional $2,665 for processing other chemicals.

Trial by the court without a jury resulted in a finding for the executrix, both on her petition for conversion and on the Thompson company's counterclaim. She was awarded judgment for $5,405.22. The sufficiency of the pleadings is not questioned and this description suffices in consequence. Thompson company appeals. We shall designate the parties as they were styled in the trial court.

■ Before ruling other features of this case, we consider the exclusion by the trial court of all evidence offered by defendant to substantiate its counterclaim. For if the ruling on the counterclaim was wrong, as defendant argues, this cause has not been completely adjudged even though the ruling for the plaintiff may be found correct. Defendant believes this exclusion resulted from application of the Dead Man's Statute, Section 491.010 RSMo 1949, V.A.M.S. The Dead Man's Statute was not invoked or applied. It was defendant's theory that the agreement expressed by the letter and endorsement could be treated as only a partial settlement of the estate's indebtedness and as not embracing the subject of the counterclaim. But the execution of the agreement stood unquestioned. It was free from ambiguity. There was no claim that it was ambiguous. There was no claim or evidence of fraud or mistake, and none of an understanding that the subject of the counterclaim had been left open for future adjustment. The signatories to the agreement had plainly adjusted all of the estate's indebtedness to defendant prior to August 31, 1950. That indebtedness had been agreed to be $4,692. The counterclaim was for an alleged further indebtedness of $2,665 claimed to have arisen also prior to August 31, 1950. The ruling was that the agreement was conclusive and could not be reopened, contradicted, or varied by parol evidence, and that it stood an absolute bar to the counterclaim. This was correct. In Pickel v. St. Louis Chamber of Commerce Ass'n, 10 Mo.App. 191, 194, affirmed 80 Mo. 65, this court said: "Almost the entire contest in the court below and in this court, related to the merits of this counter-claim. We shall not consider this question at all, for there is, at the very threshold of the case, a well-settled principle of law which excludes it from consideration entirely. That principle of law is this: That when parties, having mutual matters of account between them, growing out of a contract, deliberately account together and state a balance, and the party who, on such accounting, is found indebted to the other, pays the debt or gives a written obligation for its payment, this settlement is so far conclusive between the parties that it cannot be reopened or gone into, either at law or in equity, except upon clear proof of fraud, or mistake, or of an express understanding that certain matters were left open for future adjustment. * * * And where such an account is thus settled, the presumption is that all previous dealings between the parties relating to the subject-matter of the account, are adjusted. * * * These rules are founded in plain justice and good sense. For the preventing of litigation, the law favors and upholds the settlement of differences between the parties; and when men deliberately meet together and go over the entire subject-matter of a contract,

576

make what purports to be a final settlement of that contract, and pay and receive the money found due, or give and receive a written obligation in lieu of the money, the law considers that they mean something by so doing, and that what they mean is that every element entering into the contract, which might have been there settled, was settled, and that the settlement was intended to be a finality. The law further considers that, in the absence of fraud, mutual mistake, or an express agreement that certain matters which might have entered into the settlement should be left open for future consideration, an attempt to reopen such a settlement and litigate antecedent matters which ought to have been, and might have been embraced in it, is unjust, vexatious, productive of fraud * *. *, and in every way contrary to sound policy." McCormick v. Interstate Consol. Rapid-Transit Ry. Co., 154 Mo. 191, 200, 55 S.W. 252, 254; Caneer v. Kent, 342 Mo. 878, 882, 119 S.W.2d 214, 216. There is no substance in defendant's argument that Gerstner v. Lithocraft Studios, Inc., Mo.App., 258 S.W.2d 250, relieves it of the binding force of the agreement. That decision cites Pickel v. St. Louis Chamber of Commerce Ass'n, supra, 10 Mo.App. 194, and quotes with approval much of the language we quote. Also beside the mark are Barton Cotton Co. v. Vardell, 217 Mo.App. 691, 275 S.W. 62, and Quint v. Loth-Hoffman Clothing Co., 207 Mo.App. 391, 233 S.W. 92, dealing with records unlike this one.

The trial court permitted plaintiff's attorney to testify for her and to relate a telephone conversation with defendant's attorney. There was no evidence to show that the conversation with defendant's attorney was authorized by defendant. Vorhauer v. Sweeney, Mo.App., 217 S.W.2d 985, 986 [4]. It tended to sustain an aspect of plaintiff's case. Defendant argues that an attorney "cannot bind his client by an unauthorized act which amounts to a total or partial surrender of a substantial right." Our view of this record convinces us that the cause can be ruled without taking this conversation into account. We shall disregard it. Middelton v. Reece, Mo., 236

S.W.2d 335; Lowther v. Hays, Mo., 225 S.W.2d 708, 713.

 Complaint is made that the trial court struck from the record testimony of one of defendant's witnesses and sustained an objection to the testimony of another after he had answered. The witnesses were Swaney and Kaberg. All answers of both witnesses are in the record and they will be considered on this review de novo according as they may be deemed of competency and value. Middelton v. Reece, supra; Lowther v. Hays, supra.

 Much of the briefs covers debate of the question whether the deliveries of some of the chemicals by Winheim to the Thompson company amounted to sales and not bailments. Quite rightly defendant argues that if these deliveries were sales, this defeats plaintiff's claim that the particular chemicals involved were converted. If sales, and not bailments, title passed to the Thompson company and conversion cannot lie. Defendant's argument does not relate to the alcohol. It relates solely to the acid. Thompson testified that on receipt the acid was immediately commingled with his company's own stock of the same kind of acid. After commingling, it was not possible, he said, to "specifically identify" any acid as belonging to Winheim. According to defendant, the delivery of the acid by Winheim to the Thompson company, and the mere circumstance that it was commingled, as a matter of law constituted the transaction a sale and not a bailment. Defendant cites Martin v. Ashland Mill Co., 49 Mo.App. 23, and O'Neal v. Stone, 79 Mo.App. 279, and argues they compel such a ruling. The Martin and O'Neal cases ruled that deposits of wheat commingled with a depository's own stock were not bailments but exchanges or sales. But the rulings were not predicated on the mere fact of commingling. They were based on added circumstances. In the Martin case there was an express understanding accompanying a deposit of wheat that the depositor was to receive in exchange so many pounds of flour per bushel of wheat deposited and no wheat was to be

returned. In the 'O'Neal case there was an express understanding that the elevator operator with whom the wheat was deposited had his option to pay for the wheat (1) in money, or (2) in other specific property, or (3) to deliver wheat equal in grade to that deposited, or (4) if no wheat of equal grade was available, to deliver wheat equal to the value of that deposited but of the grade "next above or below."

■ These decisions do not reach, much less resolve, the question presented by the record with which we are dealing. The Martin case declares, and the O'Neal case does not deny, that the mere commingling of the wheat was not, standing alone, a circumstance converting the transactions into sales or exchanges. In each decision the court ruled that it was the nature of the contract and understanding of the parties that excluded the theory of bailment. The later decision in Potter v. Mt. Vernon Roller Mill Co., 101 Mo.App. 581, 73 S.W. 1005, 1006, cited by plaintiff, states: "The circumstances that the identical grain is commingled with other grain, and is not to be returned to the depositor, but a like quantity of the same kind and quality are not sufficient to convert the contract into a sale." The acid here was a standard chemical product, fungible and interchangeable. 37 C.J.S., p. 1407. This is unquestioned. That the contract between the parties, rather than the mere commingling, determines the nature of transactions involving fungible goods is fully attested by State v. Edwards, 345 Mo. 929, 935, 137 S.W.2d 447, 450–451. We have recited all the record discloses with reference to the commingling. It falls far short of establishing that the questioned transactions were sales as a matter of law.

On the other hand, we believe the record plainly establishes that title to the acid was not to pass and that the contract was not for a sale but a bailment. Of some but not large significance is the absence of evidence of any commercial or industrial usage requiring transfer of title to the acid or indicating that such a transfer would be advantageous to either party. Of great

significance is the absence of evidence, direct or circumstantial, of any contract or understanding that title was to pass. All chemicals were delivered by Winheim to the Thompson company with directions that none was to be processed except on his express order. There is no evidence that the Thompson company was free to treat Winheim's chemicals as its own, or ever did so. There is none that Winheim was not always free to require the return of all unprocessed chemicals at any time he chose. There is no explanation of the total absence of evidence that the Thompson company ever asserted, during the disputes that followed the settlement, that these acid transactions were sales and not bailments. Unexplained also is defendant's consistent treatment of the acid as plaintiff's property and not as its own. All of this is wholly inconsistent with the theory that the parties contracted and understood that title to the acid was to be transferred. Wholly inconsistent also is Thompson's endorsement on the letter plaintiff's attorneys sent to the Thompson company. By it, defendant formally admitted, and in writing, that it had on hand on August 31, 1950, a total of 13,269 pounds of acid which was plaintiff's property, not defendant's. Furthermore, discussion of other questions will show that the record is replete with admissions and conduct of defendant which refute all theories of sale, strongly characterize these transactions as bailments, and which indicate that the theory of sale is only an afterthought. We must reject the claim that the mere commingling of the acid operated to transfer title and was a sale as a matter of law, and, on the record evidence, rule that the questioned transactions were bailments as a matter of fact.

Defendant contends plaintiff made no adequate tender of the $4,692 settled upon by the contract represented by the letter and endorsement and that this absolved it from all duty to return plaintiff's property. We cannot agree. About a week after the execution of the contract on October 6, 1950, Mr. Schaefer, an attorney for the plaintiff, called Thompson. Schaefer was seeking arrangements to pay defendant the money

due it and for obtaining delivery of the chemicals. Thompson told him the alcohol was in tanks and that no one was available then to transfer it to the metal drums for delivery. He promised to attend to the transfer. A week or ten days later, Schaefer inquired of Thompson whether the alcohol had been transferred to the drums. Thompson insisted upon prior payment of the money due his company and announced he would refuse to return plaintiff's property until defendant was paid. Schaefer then asked that Thompson notify him when the chemicals were ready for delivery. He told Thompson that plaintiff's driver would deliver a check to defendant for the full amount due at the time the chemicals were delivered. Plaintiff then issued a check payable to defendant for that amount. Mr. Kaberg, Planetary's manager, was directed to deliver it to the defendant when it delivered plaintiff's property to him. Kaberg carried the check with him trying to "catch up with Mr. Thompson to present it to him." He never "caught up with him." Several times he told Mr. Carmichael, defendant's manager, "When you folks deliver to us the materials you have on hand, we will pay you." "We have a check." Whenever he went to Thompson company to "pick up anything" for Planetary, he talked to Carmichael about the check and delivery of the chemicals. At first Carmichael said the alcohol was not in the drums and defendant was unable to pipe it into them at that time. Later he said he had "no authority to do anything" and that Kaberg should "see the boss." He did agree to convey Kaberg's message to Thompson. Nothing came of this. The check was not delivered because no word came from Thompson, and Kaberg could not find him. In January of 1951, Schaefer reached Thompson by telephone and requested him to deliver the chemicals to plaintiff with instructions to Thompson's driver to refuse to release them except upon receipt of a check discharging plaintiff's full indebtedness. Thompson accepted this proposal and agreed to proceed accordingly. At no time thereafter did defendant or Thompson advise plaintiff that

her property was ready for delivery. Thompson, as a witness, admitted that he never "initiated a call" to plaintiff or her representatives at any time. Subsequently, Schaefer made numerous calls to Thompson but could not reach him. On March 26, 1951, Schaefer wrote defendant demanding delivery of the chemicals and offering again to pay on delivery the amount due the defendant. He reminded defendant of the terms of the contract. On April 11, 1951, defendant replied and sought to attach new conditions to the original contract. Since the date of the contract, the acid had advanced in price. In addition to the $4,692 previously agreed on as due defendant, it demanded also an additional payment equal to the advance in the price of the acid since the date of the contract plus all costs of warehousing and insuring it from that date. On April 20, 1951, Schaefer wrote defendant reminding it of the numerous efforts made to pay plaintiff's full indebtedness and of Thompson's promise to deliver the chemicals upon receipt of a check for $4,692. The new conditions defendant sought to add to the contract were flatly rejected by Schaefer. Again Schaefer offered to pay defendant in full under the contract if it would deliver the chemicals. Defendant did not answer. Defendant's evidence on the issue of tender is meager. Carmichael did not testify. Thompson testified only that he never saw plaintiff's check for $4,692 and that Kaberg, to his knowledge, never "sent a truck, or anyone," to Thompson company "to pick up that acid."

 Defendant first contends that there was no adequate tender because plaintiff offered a check instead of money. There is no merit in this claim. Defendant did not object to payment by check. It refused to deliver the chemicals on entirely different grounds. This was a waiver of its right to insist that plaintiff tender money instead of a check. Walsh v. St. Louis Exposition & Music Hall Ass'n, 101 Mo. 534, 548, 14 S.W. 722, 726. Defendant next contends that "even if the tender in this case had been in money * * *, there would be no valid tender because the payment to the

defendant was to be contemporaneous with the delivery of the chemicals and this would take it out of the Missouri Rule that a tender to be binding must be unqualified and unconditional." There is no merit in this claim. What defendant argues is that plaintiff was required to offer to pay defendant the $4,692 she owed whether or not defendant returned the acid, alcohol, and drums. What it overlooks is that the agreements of plaintiff and defendant were concurrent and mutual undertakings. All that was required of plaintiff was an honest offer to discharge her obligation under the contract if the defendant would discharge its own. In 12 Am.Jur., Contracts, p. 891, § 334, the rule is stated: "It may be pointed out that some misapprehension or confusion appears to have arisen from the mode of expression used in the books in treating of the necessity of a tender or offer by the parties, as applicable to the case of mutual and concurrent promises. The word 'tender' as used in such a connection does not mean the same kind of offer as when it is used in reference to the payment or offer to pay an ordinary debt due in money, where the money is offered to a creditor who is entitled to receive it, nothing further remains to be done, and the transaction is completed and ended; but it means only a readiness and willingness accompanied with an ability on the part of one of the parties to do the acts which the agreement requires him to perform, provided the other will concurrently do the things which he is required by it to do, and a notice by the former to the latter of such readiness. Such readiness, ability, and notice are sufficient evidence of, and indeed imply, an offer or tender in the sense in which those terms are used in reference to mutual and concurrent agreements. It is not an absolute, unconditional offer to do or transfer anything at all events, but it is, in its nature, conditional only, and dependent on, and to be performed only in case of, the readiness of the other party to perform his part of the agreement."

■ Our view is that this record reflects a continuous and honest effort by plaintiff to pay defendant the money due if defendant would return her property. This record reflects also a consistent and groundless refusal by defendant to accept plaintiff's offer of performance and to discharge its own obligations. Moreover, defendant's attempt, by its letter of April 20, 1951, to attach new conditions to the original contract, and its refusal to deliver the plaintiff's property unless she met them, constituted a refusal to perform according to its terms. Thereafter plaintiff was not required to tender any further offer of performance. Wayland v. Western Life Indemnity Co., 166 Mo.App. 221, 233, 148 S.W. 626, 629; Berthold v. St. Louis Electric Const. Co., 165 Mo. 280, 304, 65 S.W. 784, 790; Manzke v. Goldenberg, 149 Mo. App. 12, 23, 129 S.W. 32, 35.

■ Furthermore, defendant's detention of plaintiff's property, after plaintiff lawfully refused to meet the new conditions, although offering to pay in full under the terms of the original contract, constituted conversion of plaintiff's property. German-American Bank v. Brunswig, 107 Mo. App. 401, 404, 81 S.W. 461, 462; Sigmund v. Lowes, Mo.App., 236 S.W.2d 14, 19 [20]; 89 C.J.S., Trover & Conversion, § 50, p. 555.

■ We have reviewed the evidence relating to the market value of plaintiff's property on the date of the conversion and its weight strongly favors the sum awarded plaintiff by the judgment.

These observations cover all complaints defendant makes against the trial court's rulings and its judgment. Nevertheless, examination has been made of the entire record in obedience to our duty to review it on the law and the facts. Our review has convinced us that in it there is no error of law affecting defendant's rights, that the great weight of the evidence is in plaintiff's favor, and that the judgment clearly is for the right party. It must be affirmed.

It is so ordered.

ANDERSON, P. J., and WALTER E. BAILEY, Special Judge, concur.