MERCANTILE BANK OF SIKESTON,
Plaintiff–Appellant,

v.

J. Handy MOORE, Dorothy Moore, and
J.R. Dupont, Defendants–Respondents,
and Cross–Appellants,

and

Fredoon S. Nury, L.S. Nury, Sarkis V. Sarabian, Virginia Sarabian, Dale P. Smith, and Betty M. (Smith) Fritts, Defendants.

Nos. 20314, 20315 and 20331.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 27, 1996.

Motion for Rehearing and/or
Transfer Denied Dec. 19, 1996.

Application to Transfer Denied
Jan. 21, 1997.

Phillip J. Barkett, Jr., Dempster, Barkett, McClellan & Edwards, Joseph P. Fuchs, Sikeston, for plaintiff-appellant Mercantile Bank of Sikeston.

Manuel Drumm, Drumm, Winchester & Thornton, Sikeston, W. Edward Reeves, Ward & Reeves, Caruthersville, for defendants-respondents and cross-appellants J. Handy Moore and Dorothy Moore.

Philip R. Dupont, Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., Kansas City, for defendant-respondent and cross-appellant J.R. Dupont.

GARRISON, Judge.

This case involves three consolidated appeals from the same judgment. In Case No. 20314, Mercantile Bank of Sikeston (Mercantile) contends that the trial court erred in reforming a promissory note to provide that Defendant Dorothy Moore has no personal liability on it. In Case No. 20315, Defendants J. Handy Moore and Dorothy Moore complain about Mercantile's $21,771.03 judgment against them based on their guaranty of a promissory note. In Case No. 20331, Defendant J.R. Dupont contends that the court erred in awarding Mercantile a $120,817.31 judgment against him based on his liability under the same guaranty. We reverse and remand based upon the issues in Case No. 20314, but otherwise affirm.

## FACTS

The factual and procedural history of this case is lengthy and complex. In fact, this is the second time issues relating to it have been before us on appeal. *See Mercantile Bank of Sikeston v. Moore,* 792 S.W.2d 653 (Mo.App.S.D.1990).

Pentad, Ltd. (Pentad) was a limited partnership. Defendants J. Handy Moore and J.R. Dupont (Dupont) were among the five limited partners who each owned 20% of the stock in the general partner, Moore–Dupont

Wineries, Inc. (Moore–Dupont). Mercantile provided financing to Pentad under two promissory notes dated September 5, 1984. One was in the principal amount of $250,000 and was secured by a deed of trust on real estate (the "$250,000 note"). The other was for $200,000 and was secured by personal property (the "$200,000 note").

On October 9, 1984, each of the limited partners and their spouses signed a "Limited Continuing Guaranty" ("Limited Guaranty" or "20% Guaranty"). It provided that the limited partners and their spouses guaranteed the first $100,000 of the combined indebtedness under the $200,000 and $250,000 notes. It also provided that after the combined original indebtedness of those notes was reduced by $100,000, each partner and his spouse personally guaranteed 20% of the remaining balance due.

On December 17, 1984, Mercantile made a $150,000 loan to Moore–Dupont and a $25,000 loan to Pentad.[1] On the same date, Defendant J. Handy Moore, as well as the other limited partners and their spouses, executed documents entitled "Continuing Guaranty" in favor of Mercantile by which they guaranteed all obligations of Moore–Dupont "now or hereafter existing" (the "100% Guaranty" or "unlimited guaranty").

On April 12, 1985, Mercantile made a $125,000 unsecured loan to Pentad. Unlike the earlier loans, the note for this loan was not signed in behalf of Moore–Dupont and was signed by the individual limited partners and their spouses. Specifically, as it relates to this appeal, J. Handy Moore signed this note immediately before the designation "Ltd. Ptnr.," and Dorothy Moore signed it immediately before the words "his wife."

The business venture of Pentad did not do well and there were defaults under Mercantile's various loans. As a result, in May, 1987 Mercantile foreclosed and sold the real estate described in the deed of trust securing the $250,000 note. In June, 1987 it also sold the personal property which was security for the $200,000 note. As a result, Mercantile real-

---

1. These loans are not directly relevant to the issues raised on this appeal except to the extent

that they explain the 100% Guaranty signed the same day.

ized and applied $100,000 to the $250,000 note and $62,000 to the $200,000 note.

Mercantile then commenced efforts to collect the deficiencies under those notes. It took the position that the 100% Guaranty applied, and that each of the limited partners and spouses were liable for the entire remaining amounts owing under the $200,000 and $250,000 notes. On July 8, 1987, the attorney for the Moores wrote Mercantile's attorney, enclosing a check for $66,379.19, which was 20% of the principal and accrued interest owing on those two notes. His letter stated that the $66,379.19 was calculated pursuant to the 20% Guaranty and not the 100% Guaranty, that no amounts were included for attorney fees because they were not mentioned in the 20% Guaranty, and that the check was tendered with the understanding that Mr. and Mrs. Moore would be completely discharged under the two notes in question. Mercantile's attorney returned the check, saying that the bank did not agree with the terms of the letter, and reiterated its claim that the Moores were liable for all of the amounts owing under the notes.

On December 2, 1987, Mercantile wrote a letter to J. Handy Moore which contained three settlement proposals relating to all of the amounts it claimed under various loans to Pentad and Moore–Dupont, including the $200,000, $250,000 and $125,000 notes. The letter stated the combined balance owing on the $200,000 and $250,000 notes, and it also claimed attorney fees of $10,647.08. In response, an attorney for the Moores and Dupont wrote Mercantile's attorney on December 7, 1987. Although none of Mercantile's proposals called for such a response, he forwarded a check which represented full payment of one loan (unrelated to the issues here) and 40% of the principal and interest owing under the $200,000 and $250,000 notes (20% each in behalf of the Moores and Dupont). He stated that, in return, the Moores and Dupont were to be released from further liability on the $200,000 and $250,000 notes, including any liability for attorney fees.

On December 9, 1987, Mercantile's attorney responded to the December 7 letter, returning the check and reiterating the bank's earlier offer to settle as stated in its December 2 letter. The attorney also suggested that, since the Moores and Dupont apparently did not contest liability for at least 20% of the $200,000 and $250,000 notes, they should pay that proportional share and litigate the extent of any remaining liability under those notes. On September 29, 1988, however, J. Handy Moore made what was apparently an unconditional payment to Mercantile in the amount of $65,000, which was applied equally to the $200,000 and $250,000 notes.

Although Mercantile had contended that the 100% Guaranty applied to the $200,000 and $250,000 notes, a judgment was entered in 1991 reforming that guaranty to provide that it applied only to obligations of Moore–Dupont executed on or after December 17, 1984 (the date of the 100% Guaranty). As a result, the 100% Guaranty did not apply to the $200,000 and $250,000 notes.

Thereafter, Mercantile filed the amended petition under which the case was tried without a jury. That petition was in three counts. Counts I and II were against the limited partners and their spouses (except Mrs. Dupont) based on their liability on the $250,000 and $200,000 notes under the 20% Guaranty. Count III claimed liability of the spouses of the limited partners (except Mrs. Dupont) on the $125,000 note. Mrs. Moore alleged affirmative defenses to Count III. She also filed a counterclaim seeking to reform the $125,000 note on the theory that the note was prepared by the mutual mistake of the parties, in that they had previously agreed that it would impose no personal liability on her.

The trial court found for Mercantile under Counts I and II and entered a judgment in its favor against J. Handy Moore and Dorothy Moore in the amount of $21,771.03, after finding that Mr. Moore had earlier paid $65,000 on the notes.[2] It also entered a judgment against Dupont in the amount of $120,-

---

**2.** This apparently represents the Moores' liability for 20% of the $200,000 and $250,000 notes, including interest and attorney fees, after giving credit for Mr. Moore's payment of $65,000 in September, 1988.

817.31 as his liability for 20% of the amounts owing under those notes, including interest and attorney fees. On Count III, the court found in favor of Dorothy Moore and against Mercantile on its claim on the $125,000 note. It also found for Dorothy Moore on her counterclaim and entered judgment reforming the $125,000 note "according to the intent and mutual understanding of the parties, by stating in the body of [it] that [she] has no personal liability on [the note], but that her signature on [it] is [sic] intended by the parties thereto to release her marital interest in any real property owned by Pentad. . . ."

These appeals followed.

### STANDARD OF REVIEW

In this court-tried case, the standard of review is as provided in Rule 73.01 and interpreted in *Murphy v. Carron*, 536 S.W.2d 30, 31–32 (Mo. banc 1976). Consequently, the judgment will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously applies or declares the law. *Id.* at 32. Credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which may believe none, part or all of the testimony of any witness. *Matthews v. Moore*, 911 S.W.2d 664, 668 (Mo.App.S.D. 1995).

### CASE NO. 20314

In its sole point relied on Mercantile contends that the trial court erred in reforming the $125,000 note to provide that it created no personal liability on Dorothy Moore. In support, it primarily contends that the evidence did not satisfy the required standard of proof.

A party seeking reformation of a written instrument must show that the parties had a prior agreement which the writing failed to accurately incorporate because of a mistake. *CMI Food Service v. Hatridge Leasing*, 890 S.W.2d 420, 423 (Mo.App.W.D. 1995). A mutual mistake, in order to afford a ground for reformation, must be one which is common to both parties, and it must appear that both have done what neither intended to do. *Rainey v. Foland*, 555 S.W.2d 88, 91 (Mo.App.1977). *See also Grossman Wrecking Co. v. Bituminous Casualty Corp.*, 518 S.W.2d 719, 725 (Mo.App.1974).

In order to support reformation, the proof must be clear, cogent and convincing. *CMI Food Service v. Hatridge Leasing*, 890 S.W.2d at 423. The Missouri Supreme Court has described this burden of proof as being "beyond a preponderance of the evidence and so as to leave no room for reasonable doubt." *American Family Mut. Ins. Co. v. Bach*, 471 S.W.2d 474, 477 (Mo.1971). *See also Helmkamp v. American Family Mut. Ins. Co.*, 407 S.W.2d 559, 566 (Mo.App. 1966). The mistake must be established by the clearest evidence, and upon testimony entirely exact and satisfactory. *Grossman Wrecking Co. v. Bituminous Casualty Corp.*, 518 S.W.2d at 725.

In the instant case, evidence concerning the $125,000 note came from the testimony of Dorothy Moore, J. Handy Moore (her husband), Stan Thompson (Thompson), and the minutes of Mercantile's Discount Committee. That evidence did not meet the clear, cogent and convincing standard.

According to the evidence, Mercantile's loans to Pentad and Moore–Dupont were all handled by, and were the responsibility of, its then president, Stan Thompson. Mrs. Moore was a part owner and a member of the board of directors of another bank. She testified that she had no negotiations with Thompson concerning the note or her execution of it. Instead, she said she left that to her husband, J. Handy Moore, and that he told her that she was signing the note as his spouse in order to release whatever interest she had in Pentad's real estate, and that she was incurring no personal liability. Mrs. Moore did testify that she had a conversation at some point with Thompson about the note ("I talked to Mr. Thompson of my concern," and "I was very concerned, and he assured me that I was signing only as a spouse and that I had no liability"). Upon cross-examination, however, she testified as follows:

Q. And in that conversation he did not—that is Mr. Thompson did not tell you that

you not—that you did not have any personal liability, did he?

A. 'He assured me that I—I really don't recall. I just—As I said in my deposition, I felt much more comfortable because he told me that I had signed behind the five men, who were the Pentad Limited partners, and that I was only signing as a wife.

Q. But Mr. Thompson did not tell you that you had no personal liability on this note; did he?

A. Ten years ago I can't recall that specifically.

Q. You don't remember; is that true?

A. I don't recall. I recall the conversation that I had with him.

J. Handy Moore testified that he had conversations with Thompson about who was to sign the $125,000 note. He said that Thompson "asked that I get the signatures of the limited partners and their wives." When asked to describe those conversations, Mr. Moore said that he and Thompson "had talked on several occasions about why wives would sign anything." He also said that because he and Thompson had done business for a long time, they had "a lot of conversations," and "when you deal with somebody like that you think you understand what they're talking about." He said that he thought he understood Thompson to say that "there was some marital interest that needed to be signed because it involved real property." On cross-examination, Mr. Moore admitted that he had no specific recollection of having a conversation with Thompson concerning Mrs. Moore's liability on the note in question. On redirect by his own attorney, Mr. Moore answered affirmatively when asked if there was anything he wanted to correct from his prior testimony. He proceeded to say that the earlier questions had been whether he remembered talking to Thompson about the note, but that he certainly did talk to him about liability and was assured that Mrs. Moore had none. On re-cross-examination, he again said that he had no specific recollection of a conversation with Thompson about Mrs. Moore's liability on the $125,000 note, but remembered talking to him a number of times about "liability." Mr. Moore's testimony, however, does not indi-

cate whether these conversations about liability were with reference to the $125,000 note or with reference to the earlier notes of Pentad.

When the notes referred to in this appeal were signed, Mr. Thompson was president of Mercantile's bank in Sikeston. He subsequently left that employment and became an executive vice-president of AmeriFirst Bank in Cape Girardeau, where Mrs. Moore was on the board of directors and a 10% owner. At the time of trial, AmeriFirst was in the process of being acquired by Mercantile.

Thompson's testimony, presented at trial by the Moores, was likewise less than certain. He said that he had no memory of a conversation with Mr. Moore about the reason Mrs. Moore's signature was required on the $125,000 note. He did remember earlier conversations with Mr. Moore about spousal liability on the earlier notes. In response to questions about his deposition where he testified that he told Mrs. Moore that the reason for her signature on the $125,000 note was because of the real estate, he admitted making such a statement but said that the only such conversation he remembered with Mrs. Moore was with reference to the earlier notes. He reiterated that he had no memory of talking with her about her signature on the note in question. Later, he confirmed his deposition testimony that his intent in having the wives sign the Pentad notes was not to have them guarantee them, but because of their spousal interest in the partnership's real estate.

Mr. Thompson also admitted the truth of an affidavit which he had signed in the Moores' attorney's office. In that affidavit, he said that he told the limited partners that the signatures of their spouses were required so that the marital interests in the real estate were bound, and that he told Mrs. Moore that the reason for her signature on the note was "for the sole purpose of obtaining her marital interest in the real property owned by Pentad Limited and not as an obligor or endorser of the note." Later, Mr. Thompson again said, however, that he remembered no such conversations with Mrs. Moore, and that the only conversations he had with Mr. Moore about liability on notes was with ref-

erence to the earlier loans of Pentad. He specifically said that he remembered no conversations with either Mr. or Mrs. Moore concerning his intent regarding the $125,000 note.

Mr. Thompson also identified the minutes of a meeting of Mercantile's Discount Committee two days before the $125,000 note was signed. Those minutes stated:

President Thompson also presented loan request in the amount of $125,000 for six months for Pentad LTD. All partners and their wives to guarantee total amount of note.... Loan approved.

Although he said that sometimes there are changes to the terms of a loan after a Discount Committee meeting, he said that these minutes set out the terms and conditions under which Mercantile agreed to make this loan.

In light of the requirement that evidence must be clear, cogent and convincing to support a reformation, we have concluded that there was no substantial evidence to support reformation of the $125,000 note in the instant case. That portion of the judgment reforming the note must be reversed.

■ Mrs. Moore points out, however, that the trial court also specifically found in her favor on Count III of Mercantile's amended petition. By doing so, it found that she had no liability on the $125,000 note, and she contends that Mercantile does not raise an issue in this appeal about that portion of the judgment. She theorizes, therefore, that regardless of the result of the reformation issues, there is a final judgment, not questioned on appeal, absolving her of liability on that instrument. Mercantile, however, argues that its appeal was intended to apply to both the reformation and liability issues, and requests, in its brief, that the judgment on Count III also be reversed.

It is apparent that Mercantile believed that Mrs. Moore's liability under Count III and the reformation issue were being tried on the same theory. Our review of the record supports that view. Mrs. Moore's evidence in support of her counterclaim for reformation was indistinguishable from any that might have applied to her defense to

liability on the note. It is true that she pleaded failure of consideration, her status as an accommodation party, impairment of her right to recourse, and a violation of the Federal Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq., in her answer to Count III, in addition to mutual mistake of the parties and other allegations which she pleaded in support of her counterclaim. It is apparent, however, from a review of the evidence at trial that the issue of Mrs. Moore's liability on the $125,000 note was tried on the basis of a mutual mistake, the same theory upon which she relied for reformation. Additionally, in their comments at the beginning of trial, the attorneys for the Moores referred to mutual mistake as the basis for the reformation as well as the defense to Count III. We, therefore, construe the judgment in favor of Mrs. Moore under Count III, and the granting of her claim for reformation, to have been based on the same ground, to wit: mutual mistake. Because we have held that there was insufficient evidence to support that theory, our decision relates to both the reformation of the note and Mrs. Moore's liability under it. The judgment in favor of Mrs. Moore on the issues of reformation and liability under the $125,000 note is reversed, and the case is remanded to the trial court with instructions to enter judgment in favor of Mercantile and against Mrs. Moore on Count III and on her counterclaim.

## CASE NO. 20315

■ J. Handy Moore and Dorothy Moore appeal from Mercantile's judgment against them in the amount of $21,771.03, representing their liability for principal and interest on the $200,000 and $250,000 notes pursuant to the 20% Guaranty. They contend that they made a tender of $66,379.19 on July 8, 1987 which represented the amounts owing by them under those notes. Consequently, they argue that they should not be charged with interest after that date, and that the judgment should be restricted to $1,379.19, the difference between their tender and the $65,000 they paid on the note in September, 1988, plus interest.

On July 8, 1987, the Moores' attorney wrote Mercantile's lawyer and enclosed a

check for $66,379.19, representing 20% of the balance owing on the $200,000 and $250,000 notes. He said that nothing was included for attorney fees because the 20% Guaranty contained no provision for them. He also said:

> [A] tender of $66,379.19 by J. Handy Moore check no. ___ is herewith made with the understanding that said $66,379.19 payment is in full and complete discharge of all obligations of J. Handy Moore and Dorothy M. Moore to Mercantile Bank on the two Pentad, LTD notes referenced above [the $200,000 and $250,000 notes]. In short, the $66,379.19 payment is intended to relieve J. Handy Moore and Dorothy M. Moore of all further liability on the two loans referenced in this letter. . . .

In returning the check, Mercantile's lawyer said:

> We do not agree with the terms contained in your letter. As I have repeatedly pointed out previously, Mercantile is looking to Mr. Moore and Mrs. Moore for all of the indebtedness owed Mercantile by virtue of either the note signed or the unlimited guaranty [the 100% Guaranty] executed in December of 1984.

At the time, Mercantile apparently took the position that the 100% Guaranty applied to the two notes in question, while the Moores contended that only the 20% Guaranty applied. It was not until later (1991) that the trial court reformed the 100% Guaranty so that, by its terms, it did not apply to these notes.

Contrary to the position of the Moores that the offer of this check was a valid tender which stopped the accrual of interest, the trial court found that this was an offer of settlement and not a tender because it was not unqualified and unconditional. The court noted that it required Mercantile to abandon its claims for attorney fees and liability based on the 100% Guaranty. Consequently, it entered a judgment in Mercantile's favor in the amount of $21,771.03 [3] plus interest from the date of the judgment.

"A tender must be unconditional and unqualified to be a valid tender." *Garney Companies v. H & K Dev., Inc.*, 635 S.W.2d 85, 86 (Mo.App.W.D.1982). "Conditioning a proposed tender upon release of all claims or any other reciprocal action on the tenderee's part invalidates the tender and continues the accrual of prejudgment interest." *Insurance Co. of N. Am. v. Skyway Aviation*, 828 S.W.2d 888, 892 (Mo.App.W.D. 1992). The same is true of a tender which requires a creditor to abandon his or her position. *Curnutt v. Scott Melvin Transport, Inc.*, 903 S.W.2d 184, 190 (Mo.App.W.D. 1995); *Garney Companies v. H & K Dev., Inc.*, 635 S.W.2d at 86.

The Moores argue, however, that Mercantile did not object to the tender on the basis argued in the trial court and on which the court based its findings. They contend that by failing to do so, those objections were waived. They rely on cases such as *Capital City Motors, Inc. v. Thomas W. Garland, Inc.*, 363 S.W.2d 575, 579 (Mo. 1962), and *Citizens State Bank of Nevada v. Wales*, 469 S.W.2d 750, 758 (Mo.App.1971), for the proposition that unless an objection to a tender is timely made and the grounds specified, it is waived. Those cases, however, did not involve an issue of whether the alleged tender did in fact qualify as a tender in the first place. They do not purport to stand for the proposition that an offer of settlement can become a tender because of the failure of the creditor to object to its conditional nature. An express objection to a tender is not always required where the reasons for rejection of the tender are obvious. *Baker v. McCue–Moyle Dev. Co.*, 695 S.W.2d 906, 913 (Mo.App.E.D.1984). Mercantile's lawyer, upon returning the check, told Moores' lawyer that "[w]e do not agree with the terms contained in your letter." Although he proceeded to explain that Mercantile was looking to the Moores for all of the indebtedness, we are unable to conclude that this explanation necessarily limited the earlier express disagreement with the "terms" of the transmittal letter.

---

**3.** The amount of this judgment apparently represented 20% of the amounts owing under the 20% Guaranty, including attorney fees, plus interest, until the Moores' tender of $65,000 in September, 1988, and interest on the balance after that date.

Even if it had, Mercantile, at a minimum, rejected the Moores' "tender" based on its unwillingness to release them from liability on the notes upon the payment of amounts calculated under the 20% Guaranty rather than the 100% Guaranty. The Moores point out, however, that Mercantile's contention was later adjudicated against it when the court reformed the 100% Guaranty so as to make it clear that it did not apply to the $200,000 and $250,000 notes. They argue, therefore, that Mercantile's refusal of their "tender" was based on a theory which was later held to be inapplicable. It has been held, however, that a tender which is conditional by requiring an abandonment of the creditor's position is insufficient to stop the accrual of interest, even if there is a later adjudication contrary to the creditor's contention. *Curnutt v. Scott Melvin Transport, Inc.*, 903 S.W.2d at 190–191. *See also Garney Companies v. H & K Dev., Inc.*, 635 S.W.2d at 85–86.

While it is true that the trial court did not rely on this reasoning in reaching its judgment concerning the tender, we will not reverse a judgment where the court reaches the right result but for the wrong reason. *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318 (Mo. banc 1964); *Leistner v. Powell*, 748 S.W.2d 822, 824 (Mo.App.E.D.1988).

The Moores also argue that even if the "tender" was conditional, it would not be disqualified because it merely requested Mercantile to perform under a reciprocal, identical obligation, and therefore complied with an exception to the usual rule against tenders which are conditional. They rely on *Diehr v. Thompson Chemicals Corp.*, 281 S.W.2d 572, 579 (Mo.App.1955), in which the court held that an offer conditioned on performance by the other party was sufficient where there was a "concurrent and mutual undertaking" between the parties. There, however, the parties had agreed to a settlement of their dispute by which the plaintiff would pay a specified sum to defendant, and defendant would return certain agreed upon chemicals. The defendant contended that plaintiff's tender of the amount agreed upon, conditioned on a return of the chemicals, would have been insufficient because of the

rule requiring that tenders be unqualified and unconditional. The court noted that the agreement of the parties involved "concurrent and mutual undertakings," and that under those circumstances all that was required of the plaintiff was an honest offer to discharge her obligation under the contract if the defendant would discharge its own. That factual setting, however, was distinguished by the court from the one in the instant case. The court said that a "tender," when used with reference to mutual and concurrent promises, "does not mean the same kind of offer as when it is used in reference to the payment or offer to pay an ordinary debt due in money, where the money is offered to a creditor who is entitled to receive it, nothing further remains to be done, and the transaction is completed and ended. . . ." *Id. Diehr*, therefore, does not support the Moores' contention under these facts.

The Moores also argue that a tender is not required to stop the accrual of interest under circumstances where the tender would have been a fruitless exercise because it would have been refused, citing *Citizens State Bank of Nevada v. Wales*, 469 S.W.2d at 757. They contend that testimony by an officer of Mercantile established that the bank would have refused any tender in 1987 based on the 20% Guaranty. That testimony could have been construed as meaning that Mercantile would have refused any tender which was conditioned on an abandonment of its contention that the 100% Guaranty applied to these notes and that it was entitled to reimbursement of attorney fees. This testimony does not establish that an unqualified, unconditional tender would have been rejected.

Finally, the Moores argue that the trial court erred in concluding that their "tender" was conditional and therefore insufficient to stop the accrual of interest, based on the theory that it would require Mercantile to abandon its claim for attorney fees. They argue that the 20% Guaranty provided only that they guaranteed payment of 20% "of any remaining balance due on the combined indebtedness of the two notes," and that it contained no specific reference to attorney fees. A similar contention was rejected in

*Ulreich v. Kreutz,* 876 S.W.2d 726, 730 (Mo. App.E.D.1994).

In the instant case, the alleged tender was conditional and required Mercantile to forbear other claims, and as such did not qualify as a tender. As noted by the trial court, it was, instead, an offer of settlement. Supportive of this conclusion is the fact that J. Handy Moore, in his testimony, referred to the letter as an "offer." We also note that Mr. Moore later made an appropriate tender by paying $65,000 to Mercantile for application on the notes without condition. That portion of the judgment in favor of Mercantile against the Moores in the amount of $21,771.03 plus interest, as provided in said judgment, is affirmed.

## CASE NO. 20331

The trial court awarded Mercantile $120,817.31[4] plus interest at a per diem rate of $20.47 on its claim against Dupont as his proportionate liability on the $200,000 and $250,000 notes pursuant to the 20% Guaranty. In entering the judgment, the trial court found that the December 7, 1987 letter from Dupont's attorney did not constitute a valid tender because it was not unqualified and unconditional, but rather amounted to an offer of settlement.

In his first point on this appeal, Dupont contends that the trial court erred in holding that his tender of December 7, 1987 was invalid. He argues that he was relieved of the responsibility to make a tender because Mercantile's position that the 100% Guaranty applied made it clear that a proper tender would be a vain and idle ceremony.

On December 2, 1987, Mercantile wrote J. Handy Moore, making three alternative settlement proposals. First, it offered to settle all of the notes, including interest and attorney fees, for $46,204.66 less than was owing on them. Second, it offered to accept full payment of the notes, other than the $200,000 and $250,000 notes, plus all attorney fees owing; 20% of the amounts owing under the $200,000 and $250,000 notes each from Moore and Dupont; and they would litigate Moore

and Dupont's remaining liability, if any, under the 100% Guaranty. Third, it offered to accept payment in full of the loans other than the $200,000 and $250,000 notes, plus attorney fees owing, and they would then litigate the liability of the Moores and Dupont on those two loans. It stated that the proposal could be accepted only until December 15.

An attorney representing the Moores and Dupont wrote Mercantile's attorney, saying that they proposed to pay in full another loan in the principal amount of $150,000, and also stated that J. Handy Moore and Dupont each agreed to pay 20% of the outstanding balance of the $200,000 and $250,000 notes ($69,278.03 each, which did not include anything for attorney fees) on the condition that Dupont and the Moores would then be released from further liability on those notes. He enclosed a check for $261,944.72 (the amount of the "proposals and tenders"), but said that the "proposal" was "unified and tied together" so that acceptance of the check satisfied the "conditions of settlement" set out in the letter. On December 9, 1987, Mercantile's attorney returned the check, saying that the bank's position remained as outlined in its December 2 letter.

In support of his point, Dupont notes that Mercantile's president testified that, as of December 7, 1987, the bank was still relying on the 100% Guaranty and would not then have accepted a tender of even $75,000 under the 20% Guaranty. He argues, therefore, that a tender would have been futile and was not required in order to stop the accrual of interest. In support, he cites cases such as *Strout Realty, Inc. v. Benson,* 699 S.W.2d 795, 797 (Mo.App.S.D.1985), for the proposition that a tender is waived when the tenderee takes and maintains any position which would render a tender a vain and idle ceremony. He also refers to *Baker v. McCue–Moyle Dev. Co.,* 695 S.W.2d at 913, where the court says that "[n]o tender is necessary when it is clear that it will not be accepted."

Mercantile made it clear that it would not, as of December, 1987, have agreed to discharge Dupont, or impliedly agree that the 20% Guaranty applied, upon receipt of

---

4. That judgment was apparently for 20% of the principal amount of the $200,000 and $250,000

notes, interest until the time of the judgment, and 20% of attorney fees.

amounts calculated pursuant to that guaranty. As indicated in our discussion of Case No. 20315, it was not required to abandon its position on the guaranty issue, but Dupont sought to require just that by the December "tender." As discussed in Case No. 20315, Mercantile did not indicate that it would have rejected an unqualified, unconditional tender. Accordingly, this point is without merit and is denied.

 In his second point, Dupont contends that the trial court erred in finding that his tender of December 7, 1987 was invalid because it did not include sums for attorney fees and demanded a release. He argues that these objections were waived because Mercantile did not raise them at the time.

As indicated above, express objections are not necessary when the reasons for rejection of a tender are obvious. *See Baker v. McCue–Moyle Dev. Co.*, 695 S.W.2d at 913. In the instant case, in its letter of December 7, 1987, Mercantile clearly indicated that it was claiming attorney fees, and that it was claiming that Dupont was liable under the 100% Guaranty. It offered the three proposals outlined above. In response, however, Dupont, by his attorney's letter of December 7, sought to obtain a complete discharge upon payment of 20% and nothing for attorney fees.

In returning the amount "tendered," Mercantile's attorney responded two days later by saying that its position remained as stated in its letter of December 2. Its attorney proceeded to, in effect, suggest that an unconditional tender be made. He suggested that since the Moores and Dupont acknowledged liability for at least 20% of the $200,000 and $250,000 notes, they should pay that percentage and litigate the remainder of their liability under those notes.

This response referred directly to Mercantile's letter of December 2 which clearly indicated that it was demanding amounts owing for attorney fees, and made it clear that it would accept 20% of the notes in question only if it could litigate the remaining liability of Dupont on those obligations.

We are unable to construe the correspondence from Mercantile as completely ignoring the issues of attorney fees and a release from liability. Certainly, when the correspondence is considered as a whole, it is clear that Mercantile's reasons for not accepting the "tender" included the conditions that Dupont would be released from any claim for attorney fees and any possible further liability on the notes.

This point is denied. The judgment, as it related to Dupont, is affirmed.

The judgment in Case No. 20314, both under Count III of the amended petition and Mrs. Moore's counterclaim, is reversed. Otherwise, the judgment is affirmed. The case is remanded with instructions for the trial court to enter judgment against Dorothy Moore on Count III of Mercantile's first amended petition and on her counterclaim.

BARNEY, P.J., and PREWITT, J., concur.